# **EXHIBIT A**

*ANNEX I*

**CERTIFICATE CONCERNING A JUDGMENT IN CIVIL AND COMMERCIAL MATTERS**

**Article 53 of Regulation (EU) No 1215/2012 of the European Parliament and of the Council on jurisdiction and the recognition and enforcement of judgments in civil and commercial matters**

**1. COURT OF ORIGIN**

1.1. Name:

The High Court of Justice, Business and Property Courts of England and Wales, Commercial Court (QBD)

1.2. Address:

1.2.1. Street and number/PO box

Royal Courts of Justice, Rolls Building, 7 Rolls Buildings, Fetter Lane

1.2.2. Place and postal code

London, UK EC4A 1NL

1.2.3. Member State:

AT ☐ BE ☐ BG ☐ CY ☐ CZ ☐ DK ☐ DE ☐ EE ☐ EL ☐ ES ☐ FI ☐ FR ☐ HR ☐ HU ☐ IE ☐ IT ☐
LT ☐ LU ☐ LV ☐ MT ☐ NL ☐ PL ☐ PT ☐ RO ☐ SE ☐ SI ☐ SK ☐ UK ☒

1.3. Telephone

+4420 7947 7357

1.4. Fax:

+44870 761 7725

1.5. E-mail (if available):

Comct.issue1@justice.gov.uk

**2. CLAIMANT(S) (¹)**

2.1. Surname and given name(s)/name of company or organisation:

Banco San Juan Internacional Inc

2.2. Identification number (if applicable and if available):

2.3 Date (dd/mm/yyyy) and place of birth or if legal person of incorporation/formation/registration (if relevant and if available):

2.4. Address:

2.4.1. Street and number/PO box:

Galeria San Patricio - Suite #207, B-5 Tabonuco Street

2.4.2. Place and postal code:

Guaynabo, 00968

2.4.3. Country:

AT ☐ BE ☐ BG ☐ CY ☐ CZ ☐ DK ☐ DE ☐ EE ☐ EL ☐ ES ☐ FI ☐ FR ☐ HR ☐ HU ☐ IE ☐ IT ☐
LT ☐ LU ☐ LV ☐ MT ☐ NL ☐ PL ☐ PT ☐ RO ☐ SE ☐ SI ☐ SK ☐ UK ☐
☒ Other (please specify):

Puerto Rico

_____
(¹) Insert information for all claimants if the judgment concerns more than one.

Generated by the European e-Justice Portal

**Exhibit A - 1**

2.5. E-mail (if available):

3. Defendant(s) (²)

3.1. Surname and given name(s)/name of company or organisation:

    Petróleos de Venezuela S.A.

3.2. Identification number (if applicable or if available):

3.3 Date (dd/mm/yyyy) and place of birth or if legal person of incorporation/formation/registration (if relevant and if available):

3.4. Address:

3.4.1. Street and number/PO box:

    PETRÓLEOS DE VENEZUELA, S.A., c/o Maples and Calder, 11th Floor, 200 Aldersgate Street

3.4.2. Place and postal code:

    London, EC1A 4HD

3.4.3. Country:

    AT ☐  BE ☐  BG ☐  CY ☐  CZ ☐  DK ☐  DE ☐  EE ☐  EL ☐  ES ☐  FI ☐  FR ☐  HR ☐  HU ☐  IE ☐  IT ☐
    LT ☐  LU ☐  LV ☐  MT ☐  NL ☐  PL ☐  PT ☐  RO ☐  SE ☐  SI ☐  SK ☐  UK ☒
    ☐ Other (please specify):

3.5. E-mail (if available):

4. THE JUDGMENT

4.1. Date (dd/mm/yyyy) of the judgment:

    4  / 11  / 2020

4.2. Reference number of the judgment:

    [2020] EWHC 2937 (Comm)

4.3. The judgment was given in default of appearance:

4.3.1.  ☒ No

4.3.2.  ☐ Yes (please indicate the date (dd/mm/yyyy) on which the document instituting the proceedings or an equivalent document was served on the defendant):

    /  /

4.4. The judgment is enforceable in the Member State of origin without any further conditions having to be met:

4.4.1.  ☒ Yes (please indicate the date (dd/mm/yyyy) on which the judgment was declared enforceable, if applicable):

    /  /    **The Judgment Orders of 3 December 2020 provide for payment by 18 December 2020 after which they are enforceable.**

4.4.2.  ☐ Yes, but only against the following person(s)

4.4.3.  ☐ Yes, but limited to part(s) of the judgment (please specify)

---

(²) Insert information for all defendants if the judgment concerns more than one.

**Exhibit A - 2**

4.4.4. ☐ The judgment does not contain an enforceable obligation

4.5. As of the date of issue of the certificate, the judgment has been served on the defendant(s):

4.5.1. ☒ Yes (please indicate the date of service (dd/mm/yyyy) if known):
4 / 11 / 2020

4.5.1. The judgment was served in the following language(s):

| | | |
|---|---|---|
| ☐ BG | ☐ ES | ☐ CS |
| ☐ DA | ☐ DE | ☐ ET |
| ☐ EL | ☒ EN | ☐ FR |
| ☐ HR | ☐ GA | ☐ IT |
| ☐ LV | ☐ LT | ☐ HU |
| ☐ MT | ☐ NL | ☐ PL |
| ☐ PT | ☐ RO | ☐ SK |
| ☐ SL | ☐ FI | ☐ SV |
| ☐ Other (Please specify (ISO-code)) | | |

4.5.2. ☐ Not to the knowledge of the court

4.6. Terms of the judgment and interest:

4.6.1. Judgment on a monetary claim [3]

4.6.1.1. Short description of the subject-matter of the case:

> The Claimant sought payment of amounts due under credit agreements dated 23 March 2016 (the 2016 Credit Agreement) and 6 April 2017 (the 2017 Credit Agreements) (together, the Credit Agreements) between, amongst others, the Claimant and the Defendant.
>
> Following an Event of Default under each of the Credit Agreements, on 3 December 2018 the Claimant accelerated all amounts outstanding under the Credit Agreements and made a demand for immediate payment of those amounts by the Defendant. Full payment was not made by the Defendant and so on 18 May 2020 the Claimant issued two parallel sets of proceedings in respect of the amounts due under the 2016 Credit Agreement and 2017 Credit Agreement. The Defendant argued that it was not possible to perform its obligations under the Credit Agreements as a result of the U.S. Sanctions regime. In a combined judgment, the Court held that the Defendant's defence had no real prospect of success and issued summary judgment in respect of the claims concerning each of the Credit Agreements.

4.6.1.2. The court has ordered

> PETRÓLEOS DE VENEZUELA S.A.

~~(surname and given name(s))~~/name of the company or organisation) [4]

has to make a payment to:

> BANCO SAN JUAN INTERNACIONAL INC

~~(surname and given name(s))~~/name of the company or organisation)

4.6.1.2.1. If more than one person has been held liable for one and the same claim, the whole amount may be collected from any one of them:

4.6.1.2.1.1. ☐ Yes

4.6.1.2.1.2. ☒ No

4.6.1.3. Currency:

| | | | | |
|---|---|---|---|---|
| ☐ Euro (EUR) | ☐ Bulgarian lev (BGN) | ☐ Czech koruna (CZK) | ☐ Danish krone (DKK) | ☐ Croatian kuna (HRK) |
| ☐ Hungarian forint (HUF) | ☐ Polish zloty (PLN) | ☐ Pound Sterling (GBP) | ☐ Romanian leu (RON) | ☐ Swedish krona (SEK) |
| ☒ Other (please specify ISO code): | | | | |

USD

---

[3] If the judgment only concerns costs relating to a claim which has been decided in an earlier judgment, leave point 4.6.1 blank and go to point 4.7.
[4] If more than one person has been ordered to make a payment, insert information for all persons.

**Exhibit A - 3**

4.6.1.4. Principal amount:

| 46656068 in respect of the 2016 Credit Agreement and 37230278 in respect of the 2017 Credit Agreement. |
|---|

4.6.1.4.1.  ☐ Amount to be paid in one sum:    **Note: although a single judgment was issued in respect of both amounts, separate**
4.6.1.4.2.  ☒ Amount to be paid in instalments ([5])    **Consequential Orders dated 3 December 2020 were made by the Court.**

| Due date (dd/mm/yyy): | Amount: |
|---|---|
| 18 /12 /2020 | 46656068 |
| 18 /12 /2020 | 37230278 |

4.6.1.4.3   ☐ Amount to be paid regularly:

4.6.1.4.3.1.  ☐ per day

4.6.1.4.3.2.  ☐ per week

4.6.1.4.3.3.  ☐ other (state frequency)

4.6.1.4.3.4. From date (dd/mm/yyyy) or event:

4.6.1.4.3.5. If applicable, until (date (dd/mm/yyyy) or event):

(date (dd/mm/yyyy) or event)

4.6.1.5. Interest if applicable:

4.6.1.5.1. Interest:

4.6.1.5.1.1.  ☐ Not specified in the judgment

4.6.1.5.1.2.  ☒ Yes, specified in the judgment as follows:

4.6.1.5.1.2.1. Amount:

or:

4.6.1.5.1.2.2. Rate

| Please see the (i) continuation sheet and (ii)  First Witness Statement of Oliver George Troen, enclosed with this form. |
|---|

%

4.6.1.5.1.2.3 Interest due

from

| 03/12/2020 |
|---|

(date (dd/mm/yyyy) ~~or event~~)

to

| Date of payment |
|---|

~~(date (dd/mm/yyyy) or event) ([6])~~

4.6.1.5.2.  ☐ Statutory interest (if applicable) to be calculated in accordance with

4.6.1.5.2.1. Interest due

from

---
([5]) Insert information for each instalment.
([6]) Insert information for all periods if more than one.

**Exhibit A - 4**

(date (dd/mm/yyyy) or event)

to

(date (dd/mm/yyyy) or event) ([6])

4.6.1.5.3. ☐ Capitalisation of interest (if applicable, please specify):

4.6.2. Judgment ordering a provisional, including a protective, measure:

4.6.2.1. Short desciption of the subject-matter of the case and the measure ordered:

4.6.2.2. The measure was ordered by a court having jurisdiction as to the substance of the matter

4.6.2.2.1. ☐ Yes

4.6.3. Other type of judgment:

4.6.3.1. Short desciption of the subject-matter of the case and the rulling of the court:

4.7. Costs ([7]):

4.7.1. Currency:

☐ Euro (EUR)          ☐ Bulgarian lev (BGN)     ☐ Czech koruna (CZK)      ☐ Danish krone (DKK)      ☐ Croatian kuna (HRK)

☐ Hungarian forint (HUF)    ☐ Polish zloty (PLN)       ☒ Pound Sterling (GBP)    ☐ Romanian leu (RON)      ☐ Swedish krona (SEK)

☐ Other (please specify ISO code):

4.7.2. The following person(s) against whom enforcement is sought has/have been ordered to bear the costs:

4.7.2.1. Surname and given name(s)/name of company or organisation: ([8])

| PETRÓLEOS DE VENEZUELA S.A. |
| --- |

4.7.2.2. If more than one person has been ordered to bear the costs, the whole amount may be collected from any one of them:

4.7.2.2.1. ☐ Yes

4.7.2.2.2. ☐ No

4.7.3. The costs which recovery is sought are as follows ([9]):

4.7.3.1. ☒ The costs have been fixed in the judgment by way of a total amount (please specify amount)

| Please see the continuation sheet. |
| --- |

4.7.3.2. ☐ The costs have been fixed in the judgment by way of a percentage of total costs (please specify percentage of total)

4.7.3.3. ☐ Liability for the costs has been determined in the judgment and the exact amounts are as follows:

4.7.3.3.1. ☐ Court fees:

4.7.3.3.2. ☐ Lawyers' fees:

---

([6]) Insert information for all periods if more than one.
([7]) This point also covers situations where the costs are awarded in a separate judgment
([8]) Insert information for all persons if more than one.
([9]) In the event that the costs may be recovered from several persons, insert the breakdown for each person seperately

Generated by the European e-Justice Portal

**Exhibit A - 5**

4.7.3.3.3.   ☐ Cost of service of documents:

4.7.3.3.4.   ☐ Other:

4.7.3.4.   ☐ Other (please specify)

4.7.4. Interest on costs:

4.7.4.1   ☒ Not applicable

4.7.4.2   ☐ Interest specified in the judgment

4.7.4.2.1   ☐ Amount

> or

4.7.4.2 2.   ☐ Rate

> %

4.7.4.2 2.1. Interest due

from

> (date (dd/mm/yyyy) or event)

to

> (date (dd/mm/yyyy) or event) ([6])

4.7.4.3.   ☐ Statutory interest (if applicable) to be calculated in accordance with (please specify relevant statute):

4.7.4.3.1. Interest due from

from

> (date (dd/mm/yyyy) or event)

to

> (date (dd/mm/yyyy) or event) ([6])

4.7.4.4   ☐ Capitalisation of interest (f applicable, please specify):

Done at:

HIGH COURT OF JUSTICE, QUEEN'S BENCH DIVISION, BUSINESS & PROPERTY COURTS, COMMERCIAL COURT

on:
22/12/2020   MASTERS

MASTER DAGNALL

([6]) Insert information for all periods if more than one.

Generated by the European e-Justice Portal

**Exhibit A - 6**

Signature and/or stamp of the court of origin:

22 December 2020.

MASTER DAGNALL

**Exhibit A - 7**

**CONTINUATION SHEET**

1.    **SECTION 4.6.1.5.1.2.2 (RATE OF INTEREST)**

In respect of the 2016 Credit Agreement, Interest shall accrue on the principal debt amount of USD 39,548,555, which sum is due at the contractual rates of 8.25% per annum on the portion of the outstanding principal balance comprising Revolving Loans and 9.50% per annum on the portion of the outstanding principal balance comprising Term Loans to which the Claimant is entitled after judgment pursuant to the terms of the 2016 Credit Agreement.

In respect of the 2017 Credit Agreement, Interest shall accrue on the principal debt amount of USD 30,951,078, which sum is due at the contractual rates of 11% per annum under Loan 1 and 10.8% per annum under Loan 2 to which the Claimant is entitled after judgment pursuant to the terms of the 2017 Credit Agreement.

2.    **SECTION 4.7.3.1 (COSTS WHICH RECOVERY IS SOUGHT ARE AS FOLLOWS)**

In respect of the 2016 Claim, GBP 262,175.93 by way of interim payment.  The Defendant is also to pay the Claimant's costs, on an indemnity basis subject to detailed assessment.

In respect of the 2017 Claim, GBP 266,365.85 by way of interim payment. The Defendant is also to pay the Claimant's costs, on an indemnity basis subject to detailed assessment.

**Exhibit A - 8**





04 Nov 2020

CL-2020-000320

Neutral Citation Number: [2020] EWHC 2937 (Comm)

Case No: CL-2020-000318
CL-2020-000320

**IN THE HIGH COURT OF JUSTICE**
**OF ENGLAND AND WALES**
**COMMERCIAL COURT**
**QUEEN'S BENCH DIVISION**

Royal Courts of Justice,
Rolls Building
Fetter Lane,
London, EC4A 1NL

Date: 4 November 2020

Before :

**MRS JUSTICE COCKERILL DBE**

- - - - - - - - - - - - - - - - - - - - -

Between :

**BANCO SAN JUAN INTERNACIONAL INC**          **Claimant**

- and –

**PETRÓLEOS DE VENEZUELA S.A.**          **Defendant**

- - - - - - - - - - - - - - - - - - - - -
- - - - - - - - - - - - - - - - - - - - -

**Adam Al-Attar and Jamil Mustafa**  (instructed by **Allen & Overy LLP**)
for the **Claimant**
**Ali Malek QC and William Day** (instructed by **Gresham Legal**) for the
**Defendant**

Hearing date: 17 October 2020
Draft Judgment Sent to Parties: 29 October 2020

# Approved Judgment

I direct that pursuant to CPR PD 39A para 6.1 no official shorthand note
shall be taken of this Judgment and that copies of this version as handed
down may be treated as authentic.

**Exhibit A - 10**

**Covid-19 Protocol:  This judgment was handed down by the judge remotely by circulation to the parties' representatives by email and release to Bailii.  The date and time for hand-down is deemed to be Wednesday 4 November 2020 at 10:30am**

**Mrs Justice Cockerill:**

**Introduction**

1.     This is the second hearing of the applications for summary judgment in the above-numbered claims brought by the Claimant ("BSJI") against the Defendant ("PDVSA") (the "Claims").

2.     In brief summary, the Claims comprise two substantial claims in debt by BSJI, a bank incorporated in Puerto Rico, against PDVSA, the Venezuelan state-owned oil and gas company. The first claim ("the 2016 Claim") is for roughly US$48 million including interest and is made pursuant to a credit agreement between BSJI as Lender and PDSVA as Borrower dated 23 March 2016 ("the 2016 Credit Agreement").

3.     The second claim ("the 2017 Claim") is for roughly US$38 million and is made pursuant to a credit agreement between BSJI as Lender, PDVSA as Borrower and PDVSA Petróleo S.A. ("PDVSA Petróleo") as Guarantor dated 6 April 2017 ("the 2017 Credit Agreement", together with the 2016 Credit Agreement, "the Credit Agreements"). The Credit Agreements are governed by English law and contain an exclusive jurisdiction clause in favour of this Court.

4.     The Claims were issued on 18 May 2020. The applications for summary judgment in the Claims (the "Applications") were issued on 25 June 2020 and at a hearing on 31 July 2020 were adjourned to 16 October 2020 by order of Foxton J.  The adjournment came about because at this July hearing it first appeared that PDVSA might wish to argue that its obligation to make payment was suspended by reason of certain US Sanctions, which it said rendered such payment illegal in the place of performance.

5.     In his judgment ([2020] EWHC 2145 (Comm)), Foxton J held that PDVSA had been validly served by BSJI under the contractual mechanism for service and expressed considerable, if polite, scepticism about one of the defences now sought to be raised.

6.     He said that he was unconvinced that PDVSA could successfully establish an illegality defence on the basis of sanctions: "*It appears to be, based upon what I have heard, that any argument by PDVSA that there is a US sanctions defence is extremely difficult as a matter of law, and extremely difficult as a matter of fact*". However given the very recent instruction of a legal team for PDVSA and the lack of time

**Exhibit A - 11**

available to them to prepare for a substantial hearing he was persuaded to adjourn the matter, saying: *"The case is to be re-fixed with a half day estimate, because if there is anything in that executive order argument, as to which I have indicated I have the gravest doubts, it will either get off the ground and onto its legs in half a day or not at all"*.

7. Before me, and now represented by Mr Malek QC deploying an argument considerably expanded and refined from the version trailed before Foxton J, PDVSA submits that it has a real prospect of successfully defending both the 2016 Claim and the 2017 Claim. As to the bulk of the claims it says that however much it might wish to make the payments (in Mr Malek's words *"PDVSA wants to and has the funds to repay the bank, but it is our case that it is not possible"*), it is essentially caught between the rock of the contractual wording and the hard place of the US Sanctions.

8. It says:

   i) First, the terms of the relevant loan agreements, properly construed, have suspended its payment obligations on the imposition of relevant US sanctions.

   ii) Second, and alternatively, by reason of the rule in *Ralli Bros*, English law governed contracts are unenforceable where performance is prohibited in the place of performance, which in this case is the US.

   iii) Third, and in the further alternative, Article 9(3) of Regulation No 593/2008/EC (the "Rome I Regulation") confers a discretion on the Court to apply mandatory overriding provisions of the law of the place of performance (here, US law) to a contract governed by another law (English law) and that this discretion should be exercised in this case.

9. PDVSA also says it has a further defence to the 2017 Claim; namely that the sum in question (almost $36 million) is a disproportionate penalty, imposed for breach of the primary sums due under the 2017 Credit Agreement, and despite the fact that the primary sums have already been recovered in full. PDVSA submits that it has more than fanciful prospects of success on this further defence at trial.

10. PDVSA also puts in issue the reasonableness of the sums claimed by way of costs and expenses under the terms of the Credit Agreements. It says that the Court is not in a position on the evidence before it at this hearing to be satisfied that those costs and expenses are indeed reasonable and within the scope of the indemnity.

11. A number of other points were originally raised but were not pursued at the hearing, and are accordingly not dealt with in this judgment.

**Exhibit A - 12**

## The Background

12.   BSJI is a corporation organised under the laws of the Commonwealth of Puerto Rico and is licensed to conduct business as an international banking entity. Puerto Rico is an unincorporated territory of US.

13.   PDVSA is a Venezuelan state-owned conglomerate whose business is the exploration, production, refining, trade and supply of oil, gas and other hydrocarbon products. It has exclusive operation of the Venezuelan oil and gas reserves, which are among the largest in the world.

14.   PDVSA relies on a certain amount of background, set out below, as factual matrix relevant to the construction of the Credit Agreements.

15.   As is well known the regime of President Maduro has been subject to external criticism for some years, and the situation has become acute since the presidential election of 2018 which produced a disputed result. The question of which of Messrs Maduro and Guaidó should now properly be regarded as the country's president remains contentious.

16.   PDVSA says that Venezuela and PDVSA first came under pressure from the US during the latter part of the Obama administration. In 2014, Congress passed the Venezuela Defense of Human Rights and Civil Society Act. On 8 March 2015, President Obama issued Executive Order 13692, which targeted a small number of people within the Maduro regime. The US government also exerted pressure on US institutions to disengage from Venezuela. For example, in July 2016, Citigroup withdrew the banking services it had previously made available to the Venezuelan government, central bank and Venezuela's largest retail bank, and attempted to withdraw as pay agent for notes issued by PDVSA.

17.   The Credit Agreements were concluded in 2016 and 2017. PDVSA says that they were concluded as part of a broader trend by which Venezuelan business interests – under siege – switched from the mainland US financial system to Puerto Rico. The 2016 Credit Agreement was concluded on 23 March 2016 and the 2017 Credit Agreement was concluded on 6 April 2017. US sanctions were thus a real prospect by the time that these contracts were concluded.

18.   The existence of the Credit Agreements is not in issue. Nor is the non-payment of the relevant sums. At sub-paragraphs 10(2) to 10(4) of the Particulars, BSJI has pleaded the fact of PDVSA's payment defaults, and PDVSA's acknowledgement of its defaults and of part payments made following the notification of those defaults.  As pleaded by reference to PDVSA's letters to BSJI, and as outlined in the evidence, PDVSA does not dispute the payment defaults or its liability.  PDVSA instead asked for time to pay, citing the impact of US

4

sanctions upon PDVSA.   The liability is accordingly an admitted liability of which part payment was made, post the crystallisation of a dispute, reducing the principal amount to that now claimed.

19.     The 2016 Claim is for $46,296,562, comprising overdue principal and accrued default interest and incurred costs up to and including 17 May 2020, the day before the date of issue, plus interest and costs to which I shall come in due course.  The claim arises from the overdue principal amount of $39,548,555 drawn pursuant to the term loans and revolving credit facility agreed under the 2016 Credit Agreement. These were drawings were made in 2016 and 2017. There were partial payments to reduce an indebtedness of in total some US$170 million to this level. These were made between 2016 and 2018; some before and some after an event of default was declared.

20.     The 2017 Claim is for $36,890,182, comprising the loss of anticipated profits owing under Clause 3.04(c) of the 2017 Credit Agreement and accrued default interest and incurred costs up to and including 17 May 2020, the day before the date of issue, plus interest and costs. The claim arises from the amount of $519,383,594 drawn under the 2017 Credit Agreement, pursuant to utilisation requests under two terms loans provided for by the 2017 Credit Agreement. The amount drawn was paid by BSJI into certain trust accounts in July 2017 to fund certain of PDVSA's projects.

21.     Following PDVSA's payment defaults under the 2017 Credit Agreement, the loans were accelerated on 3 December 2018 and monies in certain trust accounts were appropriated to discharge the overdue principal and interest then owed under that agreement.

22.     The liability under this agreement therefore rests on Clause 3.04(c) of the 2017 Credit Agreement to compensate BSJI for "*the loss of anticipated profits equal to the Present Value of all fees and interest payable to [the Claimant] through the Final Maturity Date of each Loan*". That is calculated in the amount of $30,951,078 plus default interest on that amount.

23.     Returning to the wider perspective, soon after the conclusion of the 2017 Credit Agreement, the Trump administration began to issue increasingly more stringent sanctions against Venezuelan interests, including PDVSA. PDVSA contends that these were intended to be crippling and to bring about regime change. Before me they were described as a facet of "*economic warfare directed not just against the Venezuelan government but also against PDVSA*".

24.     The US sanctions relied on in PDVSA's Defence (the "US Sanctions") comprise the executive orders exhibited to the Defence (the "Executive Orders"), as regulated and administered by the Venezuela Sanctions Regulations, 31 CFR Part 591 (the "VSR"). The main events relied on are:

**Exhibit A - 14**

i)      Executive Order 13692 was expanded to target numerous other Venezuelan individuals. The first extension was to cover members of the Venezuelan Supreme Court, on 18 May 2017, shortly after the conclusion of the 2017 Credit Agreement.

ii)      On 24 August 2017, President Trump issued Executive Order 13808. Among other things, this prohibited US persons from dealing in Venezuelan sovereign debt, providing new funds to PDVSA and having anything to do with dividend payments or distributions of profit from Venezuelan state-owned companies (like PDVSA) directed to the Venezuelan government.

iii)      On 20 September 2017, the US Treasury issued advice strongly discouraging US financial institutions from providing banking services to PDVSA and other Venezuelan interests.

iv)      On 19 March 2018, President Trump issued Executive Order 13827. This targeted Venezuelan sovereign digital currencies, digital coins and digital tokens.

v)      On 21 May 2018, President Trump issued Executive Order 13835. This further targeted the secondary market in Venezuelan sovereign debt.

vi)      On 1 November 2018, President Trump issued Executive Order 13850. This Executive Order is one of the two principally relied on. It implemented blocking sanctions against persons operating in the gold sector of the Venezuelan economy, and created an executive power for further sectors of the Venezuelan economy also to be blocked in due course.

vii)      On 23 January 2019, President Trump issued a statement recognising Mr Guaidó as interim president of Venezuela in the place of Mr Maduro. Thereafter, further and significantly tougher sanctions were quickly issued against PDVSA and other Venezuela interests, as set out below.

viii)      On 25 January 2019, President Trump issued Executive Order 13857. Among other things, this amended the definition of Government of Venezuela to include PDVSA. As a result, PDVSA's issued debt became subject to the same restrictions as the Venezuelan government itself.

ix)      On 28 January 2019, the US Treasury Secretary widened the scope of Executive Order 13850 to include the Venezuelan oil sector, including PDVSA. Subsequent designations were made under Executive Order 13850 also to cover the Venezuelan financial sector on 22 March 2019 and defence and security sector on 9 May 2019.

**Exhibit A - 15**

x)   On 3 May 2019, the US Treasury issued further advice strongly discouraging US financial institutions from providing banking services to PDVSA and other Venezuelan interests.

xi)  On 5 August 2019, President Trump issued Executive Order 13884. This is the second enactment primarily relied upon. It is a general blocking sanction freezing all property held by the Venezuelan government, including PDVSA.

25.  PDVSA's General Counsel says that PDVSA has indeed been crippled by these sanctions. PDVSA's US$ accounts within Venezuela are held at Banco Bandes, which is also sanctioned. Banco Bandes cannot make any transfer to the Stipulated Account. Substantial funds outside of Venezuela have been frozen.

26.  PDVSA says that it has also been shut out of the US financial system. It contends that it has become very difficult for it to trade and impossible for it to engage in large dollar payments. PDVSA says that it now only holds bank accounts outside Venezuela in Portugal, Russia and Dominica. As to these:

i)   In Portugal, $1.3 billion is held, frozen, at Novo Banco in accounts held by PDVSA and related companies. Previously the Novo Banco accounts were used in order to service repayments under the Credit Agreements into the Stipulated Account, but never by way of direct payment; they relied on a correspondent bank in New York: previously Novo Banco's New York branch and latterly JP Morgan.  Those correspondent banks will no longer act.

ii)  In Russia, PDVSA has accounts at Gazprombank and Evrofinance Mosnarbank. There is no evidence that either bank would be able to make a payment directly to the Stipulated Account rather than relying on correspondent banks in the US; indeed, Evrofinance Mosnarbank itself is a sanctioned entity.

iii) PDVSA has an account with Zuma Bank in Dominica. This relies on UK correspondent banks.

**The principles**

27.  Subject to one point, that of foreign law, the principles applicable to an application for summary judgment are not in issue.

28.  PDVSA says that the rule against mini-trials enjoins the Court not to engage in disputed issues of fact. Foreign law – including US law – is a question of fact in English courts and a dispute as to the content of applicable foreign law is quintessentially a matter for trial not interlocutory applications. It quotes Professor Fentiman: Foreign Law in English Courts: Pleading, Proof and Choice of Law (1998) p 185:

**Exhibit A - 16**

> "the abbreviated nature of the proceedings might make it inappropriate to determine foreign law at all. The default rule [assuming foreign law to be the same as English law] has not been applied where summary judgment was sought, the proper course in such cases being to allow a defendant to contest the point at trial".

29.    PDVSA also says that factual evidence of foreign law does not suffice to prove BSJI's case. It refers to *National Shipping Corp v Arab* [1971] 2 Lloyd's Rep 363 (CA) and says that while factual evidence may be enough to dismiss a summary judgment application, this does not excuse an applicant from producing expert evidence of foreign law.

30.    PDSVA has pleaded its case on US law in its Defence, which was drafted with the input of US lawyers. Since this is an interlocutory hearing, it says that it is entitled to rely on its Defence as evidence of the matters set out therein pursuant to CPR 32.6. Neither party has expert evidence of US Law. It therefore contends that BSJI cannot succeed on a summary basis on any argument as to foreign law illegality.

31.    While this is an interesting point, I am not persuaded that it matters for present purposes, for the reasons which appear below.

## The relevant parts of the US Sanctions

32.    PDVSA's case primarily rests on Executive Order 13850 and Executive Order 13884. As to their scope:

i)    Executive Order 13850 is dated 1 November 2018. Its relevant text is reproduced as an appendix to this judgment. It originally applied to the gold sector but was extended to "*the oil sector of the Venezuelan economy*" on 28 January 2019. The oil sector of Venezuela is, for all intents and purposes, PDVSA. PDVSA contends that the US government announcements which accompanied this sectoral determination made clear that PDVSA was the express target of this extension of Executive Order 13850.

ii)    It blocks "*All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person*" of a person determined to operate in the oil sector of the Venezuelan economy.

iii)    It also covers receipt of funds from any such person.

iv)    Executive Order 13884 came into force on 5 August 2019. It was expressed to apply to the Government of Venezuela which is defined at section 6(d) to include PDVSA.

v)   It covers receipt of funds in the US from PDVSA from 5 August 2019.

vi)  In both a United States person is defined as "*any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person within the United States*".

vii) Property is defined to include money.

33.  PDVSA also points to Section 5 of Executive Order 13850 and Section 4 of Executive Order 13884 (relevant text also in the appendix) which provide:

> "a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.
>
> (b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited."

34.  PDVSA's case is that this prohibits BSJI from receiving funds from PDVSA in repayment of sums otherwise due under the Credit Agreements. It also prohibits a US correspondent bank from receiving those funds or any US person (including BSJI, the New York Federal Reserve Bank, and any correspondent bank incorporated and operating in the US) processing instructions from or on behalf of PDVSA directing payment to BSJI.

35.  It relies on a recent decision of Judge Louis L Stanton of the US District Court for the Southern District of New York, *Dresser-Rand Co v Petroleós De Venezuela, S.A.* and PDVSA Petroleo, S.A., 19 Civ 2689. The judge dismissed an application for summary judgment on the basis that Executive Order 13850 created an "impossibility of payment" to the plaintiff, who is a US-based creditor. Clearly that authority is not binding on me, and it seems to me that (i) the issue there was essentially one of domestic illegality and (ii) the test being applied (whether the party in question could demonstrate a genuine issue of material fact about whether governmental sanctions make it impracticable or impossible to pay) was a different one to the one which I have to apply. I conclude that I need not concern myself with it further.

## Section 7.03

36.  Section 7.03 in each of the 2016 Credit Agreement and the 2017 Credit Agreement provides:

**Exhibit A - 18**

"Sanctions. [PDVSA] will not repay Loans with the proceeds of

(a) business activities that are or which become subject to sanctions, restrictions or embargoes imposed by the Office of Foreign Asset Control of the U.S. Treasury Department, the United Nations Security Council and the U.S. Department of Commerce, the U.S. Department of State [sic] (collectively, 'Sanctions'); or

(b) business activities in/with a country or territory that is the subject of Sanctions (including, without limitation, Cuba, Iran, North Korea, Sudan and Syria) ('Sanctioned Country')".

37. PDVSA contends that on a straightforward reading of this clause (or via an implied term), the parties agreed PDVSA would not repay BSJI from the proceeds of (i) business activities that are or which become subject to US sanctions (Sanctioned Business); and (ii) business activities in or with a country subject to US sanctions (Sanctioned Country). PDVSA's case is that (i) all of PDVSA's business activities are sanctioned; and (ii) all of PDVSA's proceeds are ultimately derived from its business in a Sanctioned Country, namely Venezuela.

38. In those circumstances, the effect of Section 7.03 on its terms or by necessary implication must be to suspend PDSVA's payment obligations. Orally this developed into a submission that there must be a hierarchy between the payment obligations in Section 2 and this provision; and that the only way of making sense of the provisions is to read section 2 as subordinated or subject to section 7.03. PDVSA says that there is no other reasonable way to read the Credit Agreements or give them practical coherence.

39. BSJI contends that there is no suspension of the obligation to pay because Section 7.03 is a negative covenant, not a condition (precedent or subsequent) to the accrual of the repayment obligations which are defined independently by Sections 2.03 to 2.05 (as to principal) and Section 2.06 (as to interest).   There are additional, pre-default "on demand" repayment obligations, of which Section 3.04(c) is a relevant obligation.  Post-default, Section 8.02(b) permits acceleration on notice and demand, which demands can include amounts of which a demand can be made under Section 3.04(c).   These payment obligations are expressly defined.   No implied obligation is required, and none is permitted contrary to those express terms.

40. BSJI also contends that Section 7.03 is a negative covenant for the benefit of BSJI alone, and BSJI has said that it will waive that covenant to the extent payment is received into the Stipulated Account, which

**Exhibit A - 19**

is the account specified in Section 2.10 of the Credit Agreements and into which funds received will be blocked in accordance with the US sanctions described above.

41.   It points to the authorities which establish that a party's right to waive a term for its sole benefit is well-established in law: see *Hawksley v Outram* [1892] 3 Ch. 359 at 375-376 per Lindley LJ; and *Panoutsos v Raymond Hadley Corporation of New York* [1917] 2 KB 473 at 477-478 per Viscount Reading CJ ; and *Glencore Grain Ltd v Flacker Shipping Ltd* [2002] 2 All ER (Comm) at [64] per Potter LJ . It submits that waiver is unilateral and not an amendment that requires PDVSA's consent.

42.   In any event, BSJI submits, a lack of available funds by which payment could be made in conformity with Section 7.03 is a mere factual inability, not a legal impossibility, as a matter of English law.    If PDVSA, even on its reading of Section 7.03, does not have the "right" funds with which to pay, PDVSA is not excused performance.  Its case on Section 7.03 is hopeless.

43.   To this PDVSA ripostes that the courts are not normally much impressed by this argument: see e.g. *The Radauti* [1988] 2 Lloyd's Rep 416 (CA) 420 (Lloyd LJ) and 422 (Croom-Johnson LJ). In this case, the argument also fails because the agreements themselves provide that section headings are "*included for convenience of reference only and shall not affect the interpretation*" of the Credit Agreements: see Section 1.02(c). That should be respected as a matter of party autonomy: *Gregory Projects (Halifax) Ltd v Tenpin (Halifax) Ltd* [2009] EWHC 2639 (Ch) [28] (Lewison J).

44.   PDVSA also argues that the suspensory effect of Section 7.03 urged upon the Court by PDVSA in this case is the same as in *Mamancochet Mining Limited v Aegis Managing Agency Limited* [2018] EWHC 2643 (Comm). The sanctions clause in that case was in an insurance policy, and was triggered by US Iranian sanctions. Teare J held that the clause meant that "*the insurer is not liable to pay a claim where payment would be prohibited under one of the named systems of law and thus 'would expose' the [underwriters] to a sanction*" (at [50]). Teare J held that this suspended the payment obligation (rather than extinguishing it, as the underwriters contended). He dismissed the objection from the underwriters that this was uncommercial (at [78]):

> "I see no difficulty in staying the claim (during the period when liability to pay is suspended) and then lifting the stay (when the sanctions are relaxed) so as to permit the claim to be paid. It is said that this is both undesirable and uncommercial. I disagree. In my view, it would be a sensible way of managing the claim, where payment is, for the time being, prohibited."

**Exhibit A - 20**

45.   PDVSA contends that its defence is also consistent with the recent decision of the Court of Appeal in *Lamesa Investments Ltd v Cynergy Bank Ltd* [2020] EWCA Civ 821. It says that though the wording is different the reasoning is entirely consistent and that together these authorities establish that "*it is perfectly normal and sensible in commercial agreements to suspend payment obligations where payment would otherwise be in breach of unilateral US sanctions*".

*Discussion: Clause 7.03*

46.   I am not attracted by PDVSA's arguments. Ultimately it did not advance a case on condition precedent arising out of the express wording very strongly. The submission made was very much informed by the contention that the authorities suggested that this was a normal course. Dealing therefore first with the authorities on which it relies:

i)   The *Mamanchochet* case was one concerning a clause in a marine insurance policy which expressly provided that a reinsurer should not be liable to pay a claim "*to the extent that ...payment of such claim ...would expose that insurer to any sanction, prohibition or restriction under ...the trade or economic sanctions, laws, or regulations...*". That is plainly entirely different – the non-liability to pay is express. It was also a question about whether the insurers effectively went off risk or there was a suspension, so there was no issue about a liability to pay at that point.

ii)   *Lamesa* similarly concerned a case where the clause expressly provided for non-payment. There Clause 9.1 "*provided that [Cynergy] shall not be in default if during the 14 days after [Lamesa's] notice it satisfies [Lamesa] that such sums were not paid in order to comply with any mandatory provision of law, regulation or order of any court of competent jurisdiction.*" So there was an express exception to the default provision. That is obviously very unlike the present case  - in particular the wording is expressly part of the payment obligation. Further one can see in the judgment that there were good reasons, as the Court of Appeal found, for that provision in circumstances where the drafters of the contract knew that the Blocking Regulation regarded US secondary sanctions legislation as imposing a "requirement or prohibition" with which EU parties were otherwise required to "comply".

47.   I therefore do not accept the submission that the decisions demonstrate that it is perfectly normal and sensible in commercial agreements to suspend payment obligations where payment would otherwise be in breach of unilateral US sanctions. These authorities are simply decisions on their (very different) facts. PDVSA therefore fails to establish a key building block in its argument.

**Exhibit A - 21**

48.     Turning to the substance of the issue, I conclude that the clause is a negative covenant, as BSJI submits.

49.     The obvious point is that this is what it says it is. While PDVSA is right that the agreement says that section headings are for convenience, here they reflect a reality. The point is not actually one about section headings; the term covenant appears in the wording, not just in the heading. But there is also a reinforcement in the structure. The agreement is indeed structured so that this section contains negative covenants. There is a distinct section IV which (in title and in substance) contains conditions precedent. The clause also has an obvious use as worded in providing BSJI with a remedy in damages (in the alternative to a claim under the indemnity at Clause 9.04) if PDVSA makes a payment with money which is the result of sanctioned activities.

50.     The second obvious point is that there is no mention of suspension within the wording – which on its face is consistent with the assertion that it is a covenant. Yet it is not the case that the contract is silent as to suspension. There is an explicit suspension mechanism in Clause 3.02 – in favour of the Bank. This shows that the parties knew well how to make a suspension provision – if they wanted to. But this clause also serves another purpose in favour of BSJI's argument. Clause 3.02's substance indicates that in the case of illegality the result is not suspension in favour of PDVSA, but rather an acceleration.

51.     Another point which assisted BSJI's argument is that the covenant is separate from the payment obligations. It does not define when a repayment arises. The payment obligations are defined elsewhere. Mr Al-Attar took me through the various payment and interest provisions in Clause 2 and the acceleration provisions in Clause 8, defining the amount and the time at which payments are to be made.

52.     So far as concerns *The Radauti,* this was not a case of a negative covenant at all – it was a case considering whether the hindrance caused to the *Radauti* by her inability to obtain a berth overrides the provision in Clause 6 of the charter-party that time lost in waiting for a berth should count as laytime.

53.     BSJI is also correct to say that Section 7.03 is not expressed as a condition (precedent or subsequent) to any repayment obligation. It is worded independently of the repayment obligation; it is on its wording a negative covenant triggered by an accrued repayment obligation.   It gives BSJI a right to refuse receipt and a right of recourse against PDVSA (including under the indemnities under the Credit Agreement) if the covenant is breached.

54.     There also seemed to me to be force in the broader argument that PDVSA's argument is inconsistent with the factual matrix. Under

13

Section 6 ("Affirmative Covenants") the contract puts on PDVSA the obligation to maintain in full force all approvals, consents and Licences for performance of obligations under the loan documents. This is another indication, consistent with that taken from Clause 3.02, that the parties did not solve the problem of impending US Sanctions by giving PDVSA a suspension mechanism. On the contrary, the obligation to obtain all licences necessary for its performance (when there was no licence needed at the time of the contract) indicates that the obligation to pay was envisaged to continue and to put PDVSA under an obligation to do what it could to get approvals or licences. Like the acceleration provision, this points in entirely the opposite direction to PDVSA's argument.

55.   The argument for PDVSA was also advanced as an implied term, which was pleaded on the "obviousness"/business efficacy analysis, but this was taken (sensibly) fairly lightly. To the extent it was maintained, Mr Malek suggested that the implied terms he would seek would be ones which edited each of the payment obligations so as to make them subject to the posited suspension in this clause. That is a submission which only needs to be stated for the fault lines to be discerned.

56.   I am quite clear that there is no proper basis for an implied term (or, as it would have to be, terms).  As I have said, there is no basis for saying that this reading of Clause 7.02 is normal and reasonable based on the authorities. It is in substance contrary to the express terms (6.05 and 3.02), no term is spelled out as to its content, and it is very hard to see how it could be even thought to be necessary. I also tend to accept the submission of BSJI that any such term would be an insuperably difficult term to operate because the repayment obligations otherwise clearly defined would be subject to the vagaries of whether repayment "proceeds" were in fact derived from sanctioned "business activities". Also it would be problematic if it applied to some but not all business activities. There are in addition issues about what would happen regarding pre-sanction proceeds leading to questions as to how it would be triggered.

57.   As to waiver, this does not arise if BSJI is right, as I have found it is on the first point. To the extent it does, it follows that if there is a negative covenant BSJI can waive it.

58.   If, as a matter of construction there was, as PDVSA contended, a right not to pay, then PDVSA's arguments on variation would have force. But on the basis that the construction it advances is wrong, then the question is not one of variation, but genuinely one of waiver and the *Rock Advertising* point does not arise. However as I have said, in effect, waiver adds nothing.

**Exhibit A - 23**

59.   In my judgment, Section 7.03 therefore provides no basis for a suspension of the repayment obligations by the terms of the Credit Agreements.

60.   The parties also joined issue on whether the above US Sanctions activate Section 7.03 at all. I do not have to decide this point. However it seems to me that there are considerable doubts as to whether they do, for three reasons:

   i)    First, the US sanctions against Venezuela were not country-wide at the time the Credit Agreements were executed or even today (as in the case of Cuba, Iran, North Korea, Sudan and Syria at the time the agreements were entered into) so as to activate Section 7.03(b);

   ii)   Secondly, under Section 7.03(a) the "business activities" must be the subject of sanctions, which is very arguably not the case in respect of the US Sanctions on which PDVSA relies;

   iii)  Thirdly, PDVSA has historical assets derived from its activities before the PDVSA-related sanctions came into effect, including the amount of $1.3 billion held in Portugal.  As such, even if Section 7.03(a) were engaged, it is hard to see how it would apply to historical assets.

## Ralli Bros

61.   As noted earlier, PDVSA relies on the rule in *Ralli Bros v Compania Naviera Sota y Aznar* [1920] 2 KB 287 to assert that it cannot perform in accordance with US law, ("the US being the situs of the Stipulated Account"), because: (i) PDVSA cannot pay into that account; (ii) BSJI cannot receive into that account; (iii) even if PDVSA could so pay and BSJI so receive, any payment by PDVSA will be blocked in the hands of a US correspondent bank before it reaches the Stipulated Account; and (iv) in any case, PDVSA has no access to any correspondent bank, US or non-US, that might initiate the first stage of such a transfer.

62.   The *Ralli Bros* rule provides that an English law governed contract is unenforceable if performance is prohibited by the law of the place of performance (*the lex loci solutionis*). Although PDVSA tactfully quoted my own summary in *Magdeev v Tsvetkov* [2020] EWHC 887 (Comm) (at [297]), the position is perfectly well known:

> "...the Court will not enforce a contract if the performance of that contract necessarily requires an act in a friendly foreign state which would be unlawful by the law of that state. The rule does not require the parties to intend the illegality or even to be aware of the fact that what they have bargained for will involve an act unlawful by the place of performance. It simply requires it to be

**Exhibit A - 24**

> established that their bargain necessarily involves
> such an act."

63.   PDVSA relies in particular on *Libyan Arab Foreign Bank v Bankers Trust Co* [1989] QB 728. There, a dispute arose from US sanctions against Libya. No similar UK sanctions existed. The claimant sought to withdraw $131 million from its dollar account with the defendant bank in London. The defendant refused, citing the US sanctions. Staughton J held that, for the most part, the defendant was not excused by the US sanctions from making payment. The claimant had only made a demand for performance in London, and the contract governing the London account was governed by English law. Payment to the claimant in cash or some forms of bank transfer in London did not necessarily involve any performance in New York, since those means of withdrawal could be effected without any part of the transaction taking place in the US. Staughton J indicated that the exception was the bank's obligation to effect a withdrawal by bankers' draft. That would necessarily have required clearing in New York, and therefore fell within the scope of *Ralli Bros*.

64.   PDVSA says this case is very similar because in the 2016 Credit Agreement, Section 2.10 provides:

> "Payments Generally. ... Each payment by the Borrower shall be made in immediately available funds not later than 11.00 a.m. (San Juan Puerto Rico time) on the date specified herein in Dollars in immediately available funds pursuant to the wire transfer instructions attached hereto as Exhibit C".

65.   Exhibit C identifies the Stipulated Account as follows:

> "Lender's Wire Transfer Instructions
> Name:              Banco San Juan International, Inc
> Address:    165 Avenida Ponce de Leon, San Juan,
> Puerto Rico 00917
> ABA/Routing No:      0215-0228-6
> Credit to account    10001014."

66.   The 2017 Credit Agreement is in almost identical terms. The account in question is one with the Federal Reserve Bank of New York ("FRBNY") in New York. Hence PDVSA says, payment necessarily involves the doing of an illegal act in a foreign territory and *Ralli Bros* is engaged. PDVSA contends that there is no way round this. BSJI is not entitled to demand payment into an alternative "blocked" account. Nor is BSJI contractually entitled to propose opening a new account at a new bank to receive payment. This is not a case where PDVSA can choose between rendering performance in the US or somewhere else: the Credit Agreements envisage payment only in the US.

**Exhibit A - 25**

67. Further, PDVSA says that it cannot make a direct payment to the Stipulated Account but must use correspondent banks to do so. Any correspondent bank located in the US falling within the definition of "United States person" would be required to block payment. PDVSA believes that this would make payment impossible from any of its USD accounts. In effect, any significant USD transaction needs to clear the US financial system, from which PDVSA is excluded.

68. BSJI's case in its written submissions took issue with the question of whether the sanctions made the payment illegal, arguing that it is wrong on the face of the US Sanctions to say that PDVSA cannot pay and BSJI cannot receive in the Stipulated Account: PDVSA is not a US person, and so it is not prohibited from initiating a payment so long as it is clear to the US bank (intermediary and recipient) that PDVSA is the remitter, and BSJI is not prohibited from receipt provided the receipt is held in a blocked account. It also took issue with the relevance of the question of the correspondent bank on the basis that difficulties that arise other than under the law of the contract or the law of the place of its performance are irrelevant as a matter of law.

69. However in oral submissions, in the face of a determined assault on the question of whether this court could determine the question of whether there was or was not illegality absent evidence of foreign law, Mr Al-Attar took the prudent course of concentrating his submissions on the position even assuming the question of illegality were to go against him. On this basis, argument was focussed instead on the question of licences.

70. BSJI submitted on this that the sanctions are qualified. In particular, each Executive Order provides that the prohibitions set out therein *"apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order"*. General and specific licences are available from OFAC.

71. It submitted that under the terms of the Credit Agreements, in particular Clause 6.05, if PDVSA can only transfer funds to the Stipulated Account via a US correspondent bank or other component of the US financial system with such permission, PDVSA is obliged to apply for a licence from OFAC.

72. BSJI relies on the fact that PDVSA's own evidence is that it can apply to OFAC for a licence: Ms Trejo states: *"PDVSA would have to apply for a licence from OFAC"*. It also notes that PDVSA's evidence confirms both that OFAC has issued specific and general licences excepting some of the effects of the US Sanctions - including in relation to bonds issued by PDVSA. BSJI also adduces evidence that OFAC has granted licences for transfers from a blocked account with one bank to a blocked account with a different bank.

**Exhibit A - 26**

73.   On this basis it contends that even if *prima facie* performance would be illegal (which it accepts only for the purposes of this application) lawful performance under US law is still possible.  It argues that the position here is that PDVSA has failed to equip itself to perform and ought not to be excused its non-performance.

## Discussion

74.   I will deal first with the licences issue, since that was the point on which BSJI relied, before turning briefly to the question of *Ralli Bros* and the point conceded for the purposes of this application. However I will first summarise the relevant principles in operation.

*Ralli Bros and its limits*

75.   At the previous hearing when this defence was raised Foxton J referred to the "famously stark" principles which operate in relation to foreign law illegality in English Law.

76.   In general, illegality under foreign law does not frustrate or otherwise relieve a party from performance of an English law contract: see e.g. *Canary Wharf (BP4) T1 Ltd v European Medicines Agency* [2019] EWHC 335 (Ch) at [187] per Marcus Smith J. "*the validity and enforceability of a contract governed by English law is not as a general rule affected by the question whether the contract would be regarded as valid or whether its performance would be lawful according to the law of another country*".

77.   The rule in *Ralli Bros* operates as a limited exception to this general rule. It provides that an obligation under an English law contract is invalid and unenforceable, or suspended in the case of a payment obligation, insofar as the contract requires performance in a place where it is unlawful under the law of that required place of performance. (The rule in *Foster v Driscoll*, which offers another exception, is agreed not to be relevant here).

78.   BSJI suggested that this principle might equally be summarised that it must be impossible to perform the contract in a manner lawful under the law of the place of performance. However, I do not regard that as a particularly helpful suggestion, not least because it elides impossibility and unlawfulness and tempts one to think about practicability rather than the unlawfulness relied on. While there is a vibrant debate about the juridical underpinning of the *Ralli Bros* principle, and while in *Ryder Industries Limited v Chan Shui Woo* (2015) 18 HKCFAR 544, [2016] 1 HKC 323 Lord Collins at [43] endorsed as the prevailing view that the decision in *Ralli Bros* "*turned on the doctrine of impossibility of performance in English law*", that should not lead to elision with the concept of frustration. Lord Collins noted that the point is one which is really to do with conflicts and has teeth only if the governing law of the contract is not the same as the

18

**Exhibit A - 27**

law of the forum. And indeed frustration, as distinct from *Ralli Bros,* is an argument that was rejected roundly in *Libyan Arab Foreign Bank v Bankers Trust Co* [1989] 3 All ER 252 at 286g per Staughton J.

79.   The doctrine therefore offers a narrow gateway: the performance of the contract must necessarily involve the performance of an act illegal at the place of performance. Subject to the *Foster v Driscoll* principle, it is no use if the contract could be performed some other way which is legal; and it is no use if the illegal act has to be performed somewhere else.

80.   This distinction forms the basis for a line of authority, derived from the judgment of Atkin J in *Kleinwort Sons & Co. v Ungarische Baumolle Industrie Aktiengesellschaft* [1939] 2 KB 678 and relied on by BSJI, which establishes that "*it is immaterial whether one party has to equip himself for performance by an illegal act in another country*" (Staughton J in *Libyan Arab Bank*).

81.   This was developed by Teare J in *Deutsche Bank AG v Unitech Global Ltd* [2013] EWHC 2793 (Comm) at [104]-[110] thus:

> "the English law of conflicts excuses performance of an obligation where performance would be illegal by the law of the country where the obligation is to be performed but does not excuse performance where, although performance of the obligation is not illegal in the country where performance is to take place, steps necessary to enable a party to perform its obligation would be illegal in the country where such steps would be taken."

82.   BSJI also drew attention to the decision of the Court of Appeal in *Toprak v Finagrain* [1979] 2 Lloyd's Rep 98. In *Toprak*, a Turkish state organisation agreed under the terms of an English law contract to purchase wheat by opening a letter of credit "*with and confirmed by a first class US or West European bank*". The buyers failed to open the letter of credit, and in response to a claim by the sellers, asserted that, under Turkish law, it would have been illegal for them to open a letter of credit without exchange control permission from the Turkish Ministry of Finance, which they had been unable to obtain, and their breach was therefore excused by reason of the rule in *Ralli Bros*. The Court of Appeal held that *"[i]llegality by the law of Turkey [was] no answer whatever to [the] claim"*: at 114 per Denning LJ.

83.   This decision was explained by Staughton J in the *Libyan Bank* case thus (at 265f-g):

> "The Turkish buyers might have had money anywhere in the world which they could use to open a letter of credit with a United States or West

> European bank. In fact it would seem that they only had money in Turkey, or at any rate needed to comply with Turkish exchange control regulations if they were to use any money they may have had outside Turkey. But that was no defence, as money or a permit was only needed to equip themselves for performance, and not for performance itself."

*Licences and "equipping to perform"*

84.   This brings the argument to BSJI's main point, which seems to me to be well founded. As noted above, this line of authority makes clear that it is only illegality at the place of performance which is apt to provide an excuse under the *Ralli Bros* doctrine; it also makes clear that the party relying on the doctrine will in general not be excused if he could have done something to bring about valid performance and failed to do so.

85.   It is common ground that all the relevant Executive Orders contain a dispensation provision which allow disapplication if a licence is obtained. It is common ground that this can be done by applying to OFAC. It is also common ground that OFAC has in fact issued specific and general licences excepting some of the effects of the US Sanctions – and that it has done so in relation to bonds issued by PDVSA. I was taken to one example. PDVSA had issued an 8.5% bond. By "General Licence 5D" dated 15 July 2020 the US Treasury stated:

> "Except as provided in paragraph (b) of this general license, on or after October 20, 2020, all transactions related to, the provision of financing for, and other dealings in the Petróleos de Venezuela, S.A. 2020 8.5 Percent Bond that would be prohibited by Subsection I(a)(iii) of Executive Order (E.O.) 13835 of May 21, 2018, as amended by E.O. 13857 of January 25, 2019, and incorporated into the Venezuela Sanctions Regulations, 31 C.F.R. part 591 (the VSR), are authorized."

86.   There are other similar licences – for example General License 8F *"Authorizing Transactions Involving Petróleos de Venezuela, S.A. (PdVSA) Necessary for the Limited Maintenance of Essential Operations in Venezuela or the Wind Down of Operations in Venezuela for Certain Entities"*.

87.   That is echoed by BSJI's evidence by way of a clear statement in an email from a representative of OFAC, that OFAC has granted licences

Exhibit A - 29

for transfers from a blocked account with one bank to a blocked account with a different bank.

88.  None of this is surprising. It would, on the contrary, seem odd if the US Government were to offer no route for US citizens and companies who had done business with Venezuela and PDVSA prior to the sanctions being imposed, to be paid by the Venezuelan entities with which they had contracted.

89.  It follows that, whatever the meaning of the Sanctions orders, lawful performance under US law is therefore possible.  This too seems to be common ground. The real issue between the parties is whose responsibility it was to gain such a licence, with PDVSA contending that it would be worse than useless for them to make such an application.

90.  BSJI directed my attention to a number of authorities where licences have been in issue. On their face these appear to show that (absent contrary agreement) where a supervening prohibition may be lawfully circumvented by obtaining a licence, a party is not excused from performance of a contractual obligation affected by that prohibition unless and until they make reasonable efforts to apply for and are refused a licence, or prove that, even had such efforts been made, a licence would actually have been refused. It does not suffice for the non-performing party to show that it reasonably believed a licence would have been refused had such efforts been made: see *Dalmia Dairy Industries Ltd v National Bank of Pakistan* [1978] 2 Lloyd's Rep. 223 at 253 per Kerr J; and G.H. Treitel, Frustration and Force Majeure (3rd ed.) at paragraphs 8-051 and 8-054.

91.  A good example is the case of *JW Taylor & Co v Landauer & Co* [1940] 4 All ER 335.  During the Second World War, the British government prohibited the import of cereal without a licence, to facilitate rationing and to control a potential black-market. The defendants had agreed to sell 25 tonnes of butter beans to the claimants prior to the outbreak of war, and the imposition of the prohibition. The prohibition came into effect a month or so before performance was due, and the defendant did nothing. Some time after the due date, the seller made a casual enquiry to the relevant Board about the possibility of a licence but did nothing more. Singleton J rejected the argument that the defendants were prohibited from performance unless and until a licence was given and therefore excused.

> "It is conceded that they could not deal in the goods without a licence. What, then, was their duty? Their duty was to take the steps necessary to enable them to perform the contract … namely to apply for a licence."

**Exhibit A - 30**

92.  On this basis, since there was no reason to suppose that the licence, if applied for, would not have been granted, the sellers were not excused from performance of the contract.

93.  This approach is reflected in the major texts (albeit in the context of frustration of contracts of sale of goods) such as Benjamin's Sale of Goods (10th ed.) at paragraph 18-385; and Chitty (33rd ed.) at 23-047.

94.  I do not accept the contention of PDVSA that these authorities, where licences are required, are different as regards the question of the existence of an obligation to make efforts to obtain a licence. The fact that they occur in the context of sale of goods is nothing to the point; they do not depend upon any principle peculiar to sale of goods, and the argument effectively proceeds by ignoring the requirement to equip itself to perform. This is not a question of implying a term in fact, this is a question of established law. The second distinction relied upon, that they were cases where the licence requirement was in operation at the time of the contract, was plainly a false point, as the facts of the *Taylor* case make clear.

95.  The question of the incidence of the duty in sale of goods cases has been discussed in a number of cases, and apparently may turn on questions such as the particular qualifications necessary to make the application (*Peter Cassidy Seed Co v Osuustukkukauppa* [1957] 1 WLR 273, where the application could only be made by a member of the Finnish Ant Egg Exporters Association) or the possession of particular knowledge needed to make the application (*AV Pound v MW Hardy* [1956] AC 588). Those cases seem to offer no very great assistance, and indeed I was not actually referred to them by either side.

96.  Further in this context, the position in relation to a purely financial transaction would seem to be conceptually a little different. Of particular interest therefore is the case of *Libyan Investment Authority v Maud* [2016] EWCA Civ 788, a case where Mr Maud had guaranteed a loan made by the LIA to a company called Propinvest. When called upon under the guarantee, Mr Maud relied on the sanctions regime in place as making payment illegal and there arose an argument as to which party should have applied for a licence under the domestic regulations. Article 12 of those regulations stated that no claims would be satisfied if made by the LIA, and in Article 12(2) placed on the LIA the burden of showing that the claim was not prohibited. At [25], Moore-Bick LJ said:

> "If a person has promised to perform a certain obligation, whether it be to pay money or deliver goods, and fails to do so, the burden is on him to show that he was prevented from doing so by some cause for which he is not responsible. In this case,

> therefore, but for article 12(2), it would have been for Mr. Maud to show that the imposition of sanctions prevented him from performing his obligation and in order to do so he would have had to show that he could not have obtained the necessary licence from the Treasury. That was not a burden that he ever attempted to discharge".

97. In the *Maud* case, the EU sanctions regime (which had been given effect to as English law by UK regulations) reversed the contractual onus, specifically requiring the creditor to apply for a licence and prohibiting a demand by the creditor absent a licence to make that demand.  But the judgment of Moore-Bick LJ, is clear that "but for" that specific statutory reversal of the contractual onus, the debtor's duty would be to apply for a licence. Had it not been for Article 12(2) Mr Maud would have been unable to assert that his payment obligation under the guarantee was suspended on the ground of impossibility because having failed to apply for a licence, he could not say he was bound to be refused a licence. Moreover Moore-Bick LJ states that this is the position as a matter of general principle.

98. Accordingly, it would appear by analogy that in the absence of any provision to the contrary in the Credit Agreements the burden is as a matter of law on PDVSA, as debtor and the party bound to perform, to obtain the necessary licence.  In the present case, there is no statutory reversal: on the contrary the contract makes explicit and reinforces the position which would pertain absent any provision at all, namely that the burden lies on PDVSA to show that the US Sanctions prevent it from performing its payment obligations.

99. That is because under the terms of the Credit Agreements, PDVSA is obliged to apply for a licence from OFAC to the extent required to effect the necessary payments:

   i)    Section 6.05 of each Credit Agreement is an affirmative covenant which obliges PDVSA to maintain and, a *fortiori* apply, for any licence from a "*Governmental Authority which may be necessary...for the performance of its obligations under the Loan Documents*".

   ii)   The Credit Agreements define "Governmental Authority" as "*any federal, state or local court or governmental agency, ministry, authority, instrumentality or regulatory body of any jurisdiction or territory*".

100. In the light of both the default position as a matter of law and these provisions, PDVSA's contention that "*licenses are there for those seeking an exemption from complying with sanctions, not its targets*" lacks any substance. What PDVSA would need is a contractual or statutory reversal of the burden; it has no such reversal to offer.

**Exhibit A - 32**

101. PDVSA argued that reliance on Clause 6.05 was not open to BSJI because it was not pleaded. I am not attracted by this argument, bearing in mind the nature of the argument. But in any event the answer would be the same, though less clearly so, even without these clauses.

102. While it would be open to PDVSA to adduce evidence that no licence would be granted, it has not done so. Mr Malek's assertion that this is *"totally unrealistic... The US treasury is not about to accede to a request from PDVSA to make its life easier and make this litigation go away"* is not evidence. Such evidence as there is, namely the General Licence relating to PDVSA's General Bond, suggests that a licence would be granted.

103. Nor am I attracted by the argument that BSJI is not entitled to take this point at the same time as it takes the logically prior point as to whether the Sanctions would, absent a licence, mean that payment was illegal at the place of performance. BSJI is entitled to run alternative cases, and PDVSA, which positively asserts the illegality at the place of performance, cannot say that absence of illegality excused it from seeking a licence.

104. It follows that even if it were the case that the sanctions *prima facie* rendered the performance of PDVSA's payment obligations necessarily illegal at the place of performance, PDVSA cannot avail itself of the defence because it has failed to show that had it discharged its obligation to apply for a licence, that application would have failed.

*Parenthesis: Ralli Bros and prohibition*

105. As noted above, this point was not argued before me and this decision does not turn on this point. However I would add that it does appear to me (as it did to Foxton J) that PDVSA's case on this issue is beset with difficulties and I very much doubt that the very narrow gateway of *Ralli Bros* is engaged.

106. The reality of PDVSA's illegality defence is its submission that it is impossible for PDVSA to pay into the Stipulated Account at all. Although this argument has been forced with some skill into the scope of a *Ralli Bros* argument, it is not in its essence about illegality, but impracticability (*"payment by PDVSA to a US based creditor is legally impossible because of executive order 13850"*).

107. Looking purely at the *Ralli Bros* argument, the starting point is that it is not illegal or even a breach of sanctions for PDVSA (a non-US entity based outside the US) to make payment, in the sense of taking the steps it would need to take to make the payment to BSJI in the Stipulated Account (or any other account). Mr Malek tried to persuade me that if it was illegal for BSJI to receive the payment it must be

illegal for PDVSA to make it ("*If receipt is prohibited, the necessary corollary is that payment is prohibited*"), but that seems to be an argument entirely lacking in basis.

108. There are in any event questions over whether it is even illegal for BSJI to receive payment. On this I certainly struggle to understand how it is said that receipt is illegal on the basis of the wording of the Executive Orders which say merely that:

> "All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of [PDVSA] are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in."

109. Mr Al-Attar may well have been right to conclude that there was a real risk of a case being found to be arguable in circumstances where PDVSA adduced evidence that it had not been able to secure US law advice and pleaded that the relevant federal orders "*prohibit BSJI from engaging in any transaction or dealing in blocked property of PDVSA. This prohibition extends to the receipt by BSJI of any sums from PDVSA made by payment into the Stipulated Account.*"

110. However, if I had been pushed to a conclusion on this point I should certainly have been minded to hold that any such defence was one whose prospects of success were fanciful – and also that the pleading does not quite meet the relevant test. Further PDVSA's case as to its inability to get US law evidence to make good the central plank of its argument sat ill with the fact that it claimed to have pleaded US law (which it then relied on as evidence because it was verified by a statement of truth) with the benefit of legal advice.

111. I also note in passing that there remain issues also on the real underpinning of PDVSA's case, namely factual impossibility. In particular, looking at payment to the Stipulated Account:

   i) PDVSA's evidence is that it has a current banking relationship with Zuma Bank, a non-US bank, which has correspondent banking relationships with Lloyds Bank plc and Dinosaur Merchant Bank Limited, two UK banks, who have previously made payments to FRBNY instructed by PDVSA for BSJI.

   i·) There seems to be no reason why it is legally impossible, under either English or US law, for PDVSA to agree a new mandate with any bank anywhere in the world capable of initiating a transfer to FRBNY.

   i i) It was common ground that PDVSA is a going concern and now, transacting primarily in euros. Thus there would appear to be

scope for PDVSA to sell euros to fund a purchase of dollars from a non-US financial institution to fund the required transfer to BSJI.

112. Parenthetically, outside the terms of the Credit Agreements there is plainly a possibility of payment being made in euros to a bank outside the US. This would require a variation of the Credit Agreements, but it was quite clear that BSJI was amenable to such a variation, if it were to result in payment.

## Article (9)(3) of Rome I

113. PDVSA's next point concerns Article 9(3) of the Rome I Regulation. This provides:

> "Effect may be given to the overriding mandatory provisions of the law of the country where the obligations arising out of the contract have to be or have been performed, in so far as those overriding mandatory provisions render the performance of the contract unlawful. In considering whether to give effect to those provisions, regard shall be had to their nature and purpose and to the consequences of their application or non-application".

114. PDVSA says that Article 9(1) defines overriding mandatory provisions as: "*provisions the respect for which is regarded as crucial by a country for safeguarding its public interests, such as its political, social or economic organisation...*". The question is whether the law is considered to protect an interest "*judged to be essential*" by its promulgator: C-184/12 *Unamar* at [50].

115. PDVSA relies on the fact that it is common ground that the payment obligations fall to be performed in the US and contends that US sanctions ought to be regarded as part of the order public of US law. They are a central component of US foreign policy and its political and economic aims as regards Venezuela. The terms of the Executive Orders themselves make clear that they are reactions to perceived political and human rights injustices in Venezuela and describe this as "*an unusual and extraordinary threat to the national security and foreign policy of the United States*": see e.g. Executive Order 13692.

116. It submits that there is no good reason not to apply US law in this case so the prohibition on payment ought to be applied.

117. BSJI submits that there is no good reason to apply the Article in a situation where *ex hypothesi* the *Ralli Bros* exception does not apply, where there is no impossibility because of existing banking relationships and PDVSA had an ability to apply for a licence.

*Discussion*

118. I consider that Article 9(3) of Rome I adds nothing to the arguments already considered.

119. Article 9(3) gives the Court a discretion to give effect to: "…*overriding mandatory provisions of the law of the country where the obligations arising out of the contract have to be or have been performed, in so far as those overriding mandatory provisions render the performance of the contract unlawful.*"

120. However, it must do so against the background of the principles which it applies in any event. It may be that if the court in question has no equivalent rule of law, Article 9(3) will have a significant impact. However here the *Ralli Bros* defence covers very similar ground – and operates without any discretionary element. That gives pause for considering when the exercise of the discretion will be appropriate.

121. Here, given the position on the licence issue – the factor which prevents the *Ralli Bros* principle from applying, even if the other aspects of it could be made good – I conclude that it is not arguable that it would be appropriate to exercise the discretion. I also note that the difficulties which I have noted on the other aspects of PDVSA's *Ralli Bros* defence only strengthen that conclusion.

122. The question of on what basis Article 9(3) should be applicable if the payment is not caught by the *Ralli Bros* doctrine to which it bears clear relation, was not one with which PDVSA really attempted to grapple beyond invoking the demands of comity. I conclude (and indeed Mr Malek did not really suggest otherwise) that the wording of the Article does not suggest that comity is intended to provide a trump card. I agree with PDVSA that the licence point is a factor in the decision; however I conclude that it is a weighty one, and taken with the other factors referenced above that there is no real prospect of success on this argument.

**2017 Claim: The alleged Penalty**

123. The claim under the 2017 Credit Agreement is based on the Liquidated Damages Clause, Clause 3.04(c) of the 2017 Credit Agreement. That provides:

> "Compensation for Losses. Upon demand of Lender from time to time, Borrower shall promptly compensate Lender for and hold Lender harmless from any loss, cost or expense incurred by it as a result of:
>
> (a) any payment or prepayment of a Loan on a day other than in accordance with Section 2.04

**Exhibit A - 36**

(whether voluntary, mandatory, automatic, by reason of acceleration or otherwise)...

(c) the loss of anticipated profits equal to the Present Value of all fees and interest payable to [BSJI] through the Final Maturity Date of each Loan".

124.  PDVSA's obligations under Clause 3.04(c) are stated to be amongst the payment obligations of PDVSA accelerated upon BSJI giving an acceleration notice pursuant to Clause 8.02(b) and *"without presentment, demand, protest or other notice of any kind."*

125.  For the purposes of Clause 3.04(c), under Clause 1.01 of the 2017 Credit Agreement:

i)     "Final Maturity Date" means *"in the case of either Loan, the date on which the final payment of principal and interest is due thereunder, which shall be the date which is forty-eight (48) months after the date on which Disbursement of such Loan occurs"*; and

ii)    "Present Value" means *"on any date of determination, the present value as determined in a commercially reasonable manner by [BSJI] as of such date of determination of the future cash flows referenced in the calculation, discounted using the rate equal to the one year U.S. Treasury Bill rate".*

126.  On 28 January 2019, BSJI demanded payment by 5 February 2019 pursuant to Clause 3.04(c) of the 2017 Credit Agreement of amounts representing the Present Value of the interest payable to BSJI from 3 December 2018 up to and including the Final Maturity Date (the "Demand Letter").

127.  Calculated in the manner set forth in BSJI's Demand Letter, the Present Value of such amounts in respect of both of the Term Loans was $30,951,078, comprised of $20,719,446 in respect of Term Loan 1 and $10,231,632 in respect of Term Loan 2.

128.  It is not in issue that the calculation conforms to the Compensation for Losses clause, or that the discount rate is applied according to a recognised discounting formula (which formula is a rearrangement of the compound interest equation to reduce a future value to a present value).

129.  BSJI's position is that there is, as such, no basis to dispute the commercial reasonableness of the manner of the calculation, and PDVSA has not sought to do so.

**Exhibit A - 37**

130. The issue on this aspect of the case is simply whether the relevant clause is in law an unenforceable penalty clause. It is common ground that following *Makdessi v Cavendish Square Holding BV* [2015] UKSC 67, [2016] AC 1172, to impugn a provision as an unenforceable penalty, it must be (i) a secondary obligation (ii) triggered on breach of contract which (iii) imposes a disproportionate detriment on the contract breaker.

131. The parties' contentions can be simply summarised using this framework.

132. PDVSA contends that (i) this is a secondary obligation (ii) it is in substance, if not in purely technical terms, triggered by breach and (iii) it is disproportionate given that the principal and interest due at the date of acceleration were fully discharged by way of enforcement against the trust account. It also draws my attention to the fact that judges in a series of cases including *Cooden Engineering Co Ltd v Stanford* [1953] 1 QB 86 (CA), *Bridge v Campbell Discount Co Ltd* [1962] AC 600 (HL) and *Financings Ltd v Baldock* [1963] 2 QB 104 (CA) have ruled that a provision entitling the creditor to a sum of two-thirds minimum of all future payments due under a contract on contractual termination was a penalty and says that those are undisturbed by the decision in *Makdessi*.

133. BSJI contends that (i) this is a primary obligation (ii) it is not triggered by breach and (iii) given the way it is calculated it is plainly not disproportionate. It contends that the cases relied on by PDVSA should be regarded as unsafe post *Makdessi* and warns me that any conclusion that this is a penalty would cut a swathe through well-established wordings across the banking sphere and cause turmoil in the market.

*Discussion*

134. In this case it seems to me that the three limbs of the *Makdessi* test are very much intertwined. If one looks at the acceleration which gives rise to this clause as being something which is a breach, and as bringing the contract to an end, it suggests the approach which Mr Malek advocated, namely that the contract has come to an end and providing for payment of the overall interest and other amounts payable over the lifetime of the contract (albeit discounted) might be disproportionate.

135. However if one regards the contract as providing an overall agreement for a particular return over the lifetime of the contract, then not only does the mathematics inexorably drive the conclusion that the sum involved is in no way disproportionate, but also suggests that the obligation is a primary one and not a sum due (even in substance) on breach.

**Exhibit A - 38**

136. I regard the argument as one which is clear in favour of BSJI. Though Mr Malek sought to persuade me that I should hesitate long and hard before coming to a final conclusion at this preliminary stage, this is in essence a question of construction, BSJI has sought summary judgment and PDVSA have had an opportunity to adduce such evidence as it thought apt to support the contention that it was arguably a penalty.

137. There are a number of key indicators here. The first is that it is common ground that the liability under Clause 3.04(c) does not arise upon a breach of contract. On that basis PDVSA's submission that in most cases, the test continues to be a comparison against the greatest loss that could conceivably be proved to have arisen from breach (*Makdessi* at [32]) becomes somewhat strained.

138. The second is that one reason why that point is not contentious is that the clause applies also to optional and voluntary repayments. It also applies to events of default which are not breaches; in the usual way Clause 8 provides for such circumstances as Insolvency Proceedings and change of control being events of default, and adds for good measure such other non-breach defaults as PDVSA becoming entitled to claim immunity from suit or the invalidity of any of the loan documents. It is therefore not even, properly regarded, a liquidated damages clause – and the parties themselves did not give the clause this label preferring the term *"Compensation for Losses"*.

139. It follows that the payment does not arise on breach of contract, but on the (various) terms of the clause itself. I also consider that it follows from this that it is best regarded as a primary obligation, not secondary. Any other approach would suggest that it was partly due on breach and partly but not entirely a secondary obligation. That seems a most uncomfortable and indeed illogical conclusion. But there is plainly within *Makdessi* quite a lot of scope for debate about what is meant by a "secondary obligation" – with the Supreme Court having not followed the formulation in *Andrews v Australia and New Zealand Banking Group Ltd* [2012] HCA 30, (2012) 290 ALR 595. But in any event even if it were not a primary obligation (for example because the interest did not accrue before termination) that does not affect the conclusion as to not arising on breach.

140. The third indicator is the evidence to which I have referred above which establishes (without any degree of controversy) what the provision does: it reduces to a present value (on a basis which is not said to be offensive) the cashflow that BSJI was entitled to expect under the 2017 Credit Agreement had the Term Loans been performed. It therefore presents itself as a clause which encapsulates a legitimate commercial interest of BSJI. It is not, therefore, a punitive clause but one that BSJI has a legitimate commercial interest in enforcing.

**Exhibit A - 39**

141. The decision in *Makdessi* is heavily underpinned by a recognition that contracting for a legitimate commercial interest is a different thing to imposing a penalty. That is a point made repeatedly in the review of the authorities – for example at 1200F-G, 1204D. And as is so often the case, a citation of a judgment of Colman J (here in *Lordsvale Finance plc v Bank of Zambia* [1996] QB 752 at 763-4) puts the matter with impeccable clarity:

> "[There is] no reason in principle why a contractual provision the effect of which was to increase the consideration payable under an executory contract upon the happening of a default should be struck down as a penalty if the increase could in the circumstances be explained as commercially justifiable, provided always that its dominant purpose was not to deter the other party from breach."

142. Similarly, in the speech of Lord Neuberger and Lord Sumption (with whom Lord Carnwath and Lord Clarke agreed), their Lordships said, at [32]:

> "The true test is whether the impugned provision is a secondary obligation which imposes a detriment on the contract-breaker out of all proportion to any legitimate interest of the innocent party in the enforcement of the primary obligation."

143. To the same effect, Lord Mance held at [152]:

> "What is necessary in each case is to consider, first, whether any (and if so what) legitimate business interest is served and protected by the clause, and, second, whether, assuming such an interest to exist, the provision made for the interest is nevertheless in the circumstances extravagant, exorbitant or unconscionable. In judging what is extravagant, exorbitant or unconscionable, I consider (despite contrary expressions of view) that the extent to which the parties were negotiating at arm's length on the basis of legal advice and had every opportunity to appreciate what they were agreeing must at least be a relevant factor."

144. One may also see the same point in Lord Hodge's statement at [255]:

> "[T]he correct test for a penalty is whether the sum or remedy stipulated as a consequence of a breach of contract is exorbitant or unconscionable when

31

**Exhibit A - 40**

> regard is had to the innocent party's interest in the
> performance of the contract."

145. Further not only does this approach encapsulate a legitimate
commercial interest, it is a legitimate commercial interest which was
included in a contract agreed to by sophisticated commercial parties
after much negotiation and legal advice. This is exactly the kind of
case where the conclusion that a provision is in its nature penal will
be reached with more caution. As Lords Neuberger and Sumption said
at [35]:

> "In a negotiated contract between properly advised
> parties of comparable bargaining power, the strong
> initial presumption must be that the parties
> themselves are the best judges of what is
> legitimate in a provision dealing with the
> consequences of breach."

146. This links to the point which Mr Al-Attar made as to the implications
for a variety of highly lawyered, sophisticated agreements if I were to
reach the opposite conclusion. Interestingly the potential of such
arguments in this context was considered – and flagged in a sense
contrary to PDVSA's argument - at [42] of the judgment (1209F-G):

> "Modern contracts contain a very great variety of
> contingent obligations. Many of them are
> contingent on the way that the parties choose to
> perform the contract. There are provisions for
> termination on insolvency, contractual payments
> due on the exercise of an option to terminate,
> break-fees chargeable on the early repayment of a
> loan or the closing out of futures contracts in the
> financial or commodity markets, …, to take only
> some of the more familiar types of clause. The
> potential assimilation of all of these to clauses
> imposing penal remedies for breach of contract
> would represent the expansion of the courts'
> supervisory jurisdiction into a new territory of
> uncertain boundaries, which has hitherto been
> treated as wholly governed by mutual agreement."

147. All of this is very different to the cases on which PDVSA relied. Before
turning to those cases I note that it may no longer be a safe
assumption that they are all good law. However as they are all plainly
distinguishable, that is an argument for another day and another
case.

148. The Compensation for Losses clause here does not confer on BSJI the
right to the undiscounted amount of future interest, which it has been
suggested (in the context of a guarantee for the construction of a ship

32

to be paid for in instalments) would amount to an unenforceable penalty clause when coupled with an acceleration clause: see the obiter dictum in *The Angelic Star* [1999] GCCR 1157, in which Sir John Donaldson MR said :

> "Clearly a clause which provided that in the event of any breach of contract a long term loan would immediately become repayable and that interest thereon for the full term would not only be still payable but would be payable at once would constitute a penalty as being a payment of money stipulated as in terrorem of the offending party'"

149. Here Clause 3.02 merely crystallises the benefits of BSJI's right to interest, if the contract had been performed, discounting the same to a present value to represent a genuine pre-estimate of BSJI's lost income on the two Term Loans. So assessed, the purpose of the Liquidated Damages Clause is plainly not to put PDVSA in terrorem of default. BSJI plainly has a legitimate interest in lost loan income, and the effect of Section 3.04(c) is plainly not disproportionate to that interest.

150. Similarly in *Cooden*; this was a case concerning a hire purchase agreement relating to a car which provided that if the owners repossessed the car, the hirer was to pay all the outstanding instalments of hire which would have been payable if the agreement had not been terminated. This represents an agreement with no discounted calculation. It is also as Mr Al-Attar noted, a situation which would now be dealt with under consumer contract regulations. So too would both *Bridge v Campbell Discount* (a minimum payment clause, and hence again a blunt instrument compared to this case) and *Financings v Baldock* (either two thirds or the remaining sums due, undiscounted, whichever was greater). As to both these latter cases I reject the equivalence which Mr Malek posited between the two third minimum payment clauses there, and the sophisticated present value calculation in this case.

151. In sum, I have no difficulty at all in concluding that the clause in this case is not a penalty and that the reverse is an argument with no real prospect of success. It follows that BSJI is entitled to judgment on the 2017 Claim also.

## Costs

152. Finally, PDVSA does not admit the reasonableness or relevance of the out of pocket expenses claimed under Clause 9.04(a) of the 2016 Credit Agreement and 10.04(a) of the 2017 Credit Agreement, amounting to over $1.5 million. It says that little more than headline

**Exhibit A - 42**

figures have been given for the legal and professional service costs of Shutts & Bowen, DLA Piper, Allen & Overy, Holland & Knight, Winston & Strawn, Servulo & Associados and Maples & Calder. PDVSA says that at the very least, hourly rates, times, and basic narratives should be disclosed so that the reasonableness and relevance of those expenses can be tested.

153. ESJI contends that there is no obligation to provide such materials because it is entitled to these costs on an indemnity basis. The 2016 and 2017 Credit Agreements each provide for a contractual entitlement to costs.  Clauses 9.04 and 10.4 of the 2016 and 2017 Credit Agreements respectively provide:

> "The Borrower shall pay...(ii) all reasonable out of pocket expenses incurred by [the] Lender and its Affiliates (including the reasonable and documented fees, charges and disbursements of any counsel for [the] Lender and its Affiliates) in connection with the enforcement or protection of its rights (A) in connection with this Agreement".

154. BSJI reminds me that a party with the benefit of a contractual right to costs can elect to rely on that right or to seek a costs order from the court under Section 51 of the Senior Courts Act 1981. These are two alternative remedies: see *John v Price Waterhouse* [2002] 1 WLR 953 at [22]-[23] per Ferris J.

155. BSJI's submission is that while the relevant clauses quoted above limit the contractual entitlement to costs by reference to a standard of reasonableness, similar words have been construed as an entitlement to costs on the indemnity basis. A recent example is the judgment of Moulder J in: *Alafco v Hong Kong Airlines Ltd* [2019] EWHC 3668 (Comm) at [12], applying *Macleish v Littlestone* [2016] EWCA Civ at [38]-[44] per Briggs LJ. Accordingly, BSJI says that where there is a contractual entitlement to costs incurred in the enforcement of a contractual right, there is a presumption that the costs incurred are reasonable.

156. BSJI says that bearing in mind that (i) any more detailed description of the tasks undertaken would require a waiver of privilege and (ii) PDVSA has not said the hours or rates claimed are not honestly claimed, sufficient detail has been given. It says that the evidence describes in appropriate terms the tasks undertaken by the lawyers involved, states the amount of fees incurred and confirms that all such fees are at standard market rates. The amounts claimed are summarised in the table below. BSJI says that they are all are proportionate to the sums claimed in the substantive action:

|  | **2016** | **2017** |
| --- | --- | --- |
| Allen & Overy LLP | $303,867 | $303,867 |

**Exhibit A - 43**

| | | |
|---|---|---|
| DLA Piper LLP | $70,403 | $70,404 |
| Holland and Knight LLP | $32,100 | $32,101 |
| Maples | $21,926 | $43,852 |
| Servulo & Associados | $17,976 | $17,976 |
| Shutts & Bowen LLP | $293,101 | $250,208 |
| Winston & Strawn LLP | $116,496 | $116,496 |

*Discussion*

157. On this is seems to me that the course both of prudence and fairness is to pursue what was both parties' backstop option, namely the assessment of costs on the indemnity basis. The aggregate costs are $855,869 for the 2016 Claim and $834,904 for the 2017 Claim. Those are very significant costs and it seems to me not inconceivable that, even on the indemnity basis, there might be an element of unreasonableness which would fall outside of the ambit of the contractual entitlement. A costs judge will be best equipped to deal with the question of the level of detail which is appropriate, bearing in mind the question of privilege.

**Exhibit A - 44**

---

## APPENDIX:
## US SANCTIONS

---

1. The relevant provisions of the Executive Orders are:

(1) In Executive Order 13692 of President Barack Obama, dated 8 March 2015:

"*I, BARACK OBAMA, President of the United States of America, find that the situation in Venezuela,...constitutes an unusual and extraordinary threat to the national security and foreign policy of the United States, and I hereby declare a national emergency to deal with that threat. I hereby order:*

***Section 1***. *(a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in...*

*(i) ...the persons listed in the Annex to this order [which persons did not included PDVSA]*
*...*
*(c) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order...*
*...*
***Sec. 4.*** *The prohibitions in section 1 of this order include but are not limited to:*
*...*
*(b) the receipt of...funds from any such person...*
*...*
***Sec. 6.*** *For the purposes of this order:*
*...*
*(c) ..."United States person" means any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States;*
*(d)... "Government of Venezuela" means the Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela, and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela.*
*...*

36

**Exhibit A - 45**

*Sec. 13. This order is effective at 12:01 am eastern daylight time on March 9, 2015."*

(2) In Executive Order 13808 of President Donald J Trump, dated 24 August 2017:

*"I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015,...hereby order as follows:*

*Section 1. (a) All transactions related to, provision of financing for, and other dealings in the following by a United States person or within the United State are prohibited:*

*(i) new debt with a maturity greater than 90 days of Petroleos de Venezuela S.A. (PdVSA);*

*(ii) new debt with a maturity greater than 30 days, or new equity, of the Government of Venezuela, other than debt of PdVSA covered by subsection (a)(i) of this section;*

*(iii) bonds issued by the Government of Venezuela prior to the effective date of this order; or*

*(iv) dividend payments or other distributions of profits to the Government of Venezuela from any entity owned or controlled, directly or indirectly, by the Government of Venezuela.*

*(b) The purchase, directly or indirectly, by a United States person or within the United States, of securities from the Government of Venezuela, other than securities qualifying as new debt with a maturity of less than or equal to 90 or 30 days as covered by subsections (a)(i) or (a)(ii) of this section, respectively, is prohibited.*

*(c) The prohibitions in subsections (a) and (b) apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license granted before the effective date of this order.*

*...*

*Sec 3. For the purposes of this order:*

*...*

*(c) ..."United States person" means any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States; and*

*(d)... "Government of Venezuela" means the Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and PdVSA, and any*

**Exhibit A - 46**

person owned or controlled by, or acting for or on behalf of, the Government of Venezuela.

...

*Sec. 7.* This order is effective at 12:01am eastern daylight time on August 25, 2017."

(3) In Executive Order 13827 of President Trump, dated 19 March 2018:

"*I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015, and relied upon for additional steps taken in Executive Order 13808 of August 24, 2017...hereby order as follows:*

*Section 1.* (a) All transactions related to, provision of financing for, and other dealings in, by a United States person or within the United States, any digital currency, digital coin, or digital token, that was issued by, for, or on behalf of the Government of Venezuela on or after January 9, 2018 are prohibited as of the effective date of this order.

(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order, and notwithstanding ay contract entered into or any license or permit granted before the effective date of this order.

...

*Sec. 3.* For the purposes of this order:

...

(c) ..."United States person" means any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches of such entities), or any person in the United States; and

(d)... "Government of Venezuela" means the Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela.

...

*Sec. 7.* This order is effective at 12:15 p.m. eastern daylight time on March 19, 2018."

(4) In Executive Order 13835 of President Trump, dated 21 May 2018:

"*I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015, and relied upon for additional steps taken in Executive Order 13808 of August 24,*

**Exhibit A - 47**

*2017 and Executive Order 13827 of March 19, 2018,....hereby order as follows:*

**Section. 1.** *(a) All transactions related to, provision of financing for, and other dealings in the following by a United States person or within the United States are prohibited:*

*(i) the purchase of any debt owed to the Government of Venezuela, including accounts receivable;*

*(ii) any debt owed to the Government of Venezuela that is pledged as collateral after the effective date of this order, including accounts receivable; and*

*(iii) the sale, transfer, assignment, or pledging as collateral by the Government of Venezuela of any equity interest in any entity in which the Government of Venezuela has a 50 percent or greater ownership interest.*

*(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted before the effective date of this order.*
...

**Sec. 3.** *For the purposes of this order:*
...
*(c) ..."United States person" means any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches of such entities), or any person within the United States; and*

*(d)... "Government of Venezuela" means the Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA), and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela.*
...
**Sec. 6.** *This order is effective at 12:30pm eastern daylight time on May 21, 2018."*

(5) In Executive Order 13850 of President Trump, dated 1 November 2018:

*"I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015, and relied upon for additional steps taken in Executive Order 13808 of August 24,*

**Exhibit A - 48**

*2017, Executive Order 13827 of March 19, 2018, and Executive Order 13835 of May 21, 2018,....hereby order as follows:*

**Section 1.** *(a) All property and interests in property that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person of the following persons are blocked and may not be transferred, paid, exported, withdrawn or otherwise dealt in: any person determined by the Secretary of the Treasury, in consultation with the Secretary of State:*

*(i) to operate in the gold sector of the Venezuelan economy or in any other sector of the Venezuelan economy as may be determined by the Secretary of the Treasury, in consultation with the Secretary of State...*

*...*

*(b) The prohibitions in subsection (a) of this section apply except to the extent provided by statutes, or in regulations, orders, directives or licenses that may be issued pursuant to this order, and notwithstanding any contract entered into or any license or permit granted prior to the date of this order.*

*...*

**Sec. 6.** *For the purposes of this order:*

*...*

*(c) ..."United States person" means any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person within the United States;*

*(d)... "Government of Venezuela" means the Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela, and any person owned or controlled by, or acting for or on behalf of, the Government of Venezuela."*

(6) In Executive Order 13857 of President Trump, dated 25 January 2019:

*" I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015, and relied upon for additional steps taken in Executive Order 13808 of August 24, 2017, Executive Order 13827 of March 19, 2018, Executive Order 13835 of May 21, 2018, and Executive Order 13850 of November 1, 2018,....hereby order:*

**Section 1.** *(a) Subsection (d) of Section 6 of Executive Order 13692, subsection (d) of section 3 of Executive Order 13808, subsection (d) of section 3 of Executive Order 13827, subsection (d) of section 3 of Executive Order 13835, and subsection (d) of section 6 of Executive Order 13850, are hereby amended to read as follows:*

40

**Exhibit A - 49**

*"(d) the term "Government of Venezuela" includes… the Central Bank of Venezuela and Petroleos de Venezuela S.A. (PDVSA)…"."*

(7) In the Determination of US Secretary of the Treasury, Steven T. Mnuchin, dated 28 January 2019 (the "**Sectoral Determination**"):

*"To further address the extraordinary threat to the national security and foreign policy of the United States described in E.O. 13850, and in consultation with the Secretary of State, I hereby determine that section 1(a)(i) shall apply to the oil sector of the Venezuelan economy."*

(8) In Executive Order 13884 of President Trump, dated 5 August 2019:

*"I, DONALD J. TRUMP, President of the United States of America, in order to take additional steps with respect to the national emergency declared in Executive Order 13692 of March 8, 2015,…hereby order:*

***Section 1.** (a) All property and interests in property of the Government of Venezuela that are in the United States, that hereafter come within the United States, or that are or hereafter come within the possession or control of any United States person are blocked and may not be transferred, paid, exported, withdrawn, or otherwise dealt in…*
*…*
*(c) The prohibitions in subsections (a)-(b) of this section apply except to the extent provided by statutes, or in regulations, orders, directives, or licenses that may be issued pursuant to this order,  and notwithstanding any contract entered into or any license or permit granted prior to the effective date of this order.*
*…*
***Sec. 3.** The prohibitions in section 1 of this order include:*
*…*
*(b) the receipt of…funds from any such person…*
*…*
***Sec. 4.** (a) Any transaction that evades or avoids, has the purpose of evading or avoiding, causes a violation of, or attempts to violate any of the prohibitions set forth in this order is prohibited.*

*(b) Any conspiracy formed to violate any of the prohibitions set forth in this order is prohibited.*
*…*
***Sec. 6.** For the purposes of this order:*
*…*
*(c) …"United States person" means any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person within the United States; and*

**Exhibit A - 50**

(d)..."*Government of Venezuela" includes the state and Government of Venezuela, any political subdivision, agency, or instrumentality thereof, including the Central Bank of Venezuela and Petroleos de Venezuela, S.A. (PdVSA),...*

***Sec.10***. *This order is effective at 9:00am eastern daylight time on August 5, 2019."*

2.   As to the VSR:

(1) §591.201 provides:

"*All transactions prohibited pursuant to Executive Order 13692 of March 8, 2015, or any further Executive orders issued pursuant to the national emergency declared in Executive Order 13692, are prohibited pursuant to this part."*

(2) §591.202, inter alia, states:

"*(a) Any transfer after the effective date that is in violation of any provision of this part or of any regulation, order, directive, ruling, instruction, or license issued pursuant to this part, and that involves any property or interest in property blocked pursuant to §591.20, is null and void...*
*...*
*(c) Unless otherwise provided, a license or other authorisation issued by OFAC before, during, or after a transfer shall validate such transfer or make it enforceable to the same extent that it would be valid or enforceable but for the provisions of this part and any regulation, order, directive, ruling, instruction, or license issued pursuant to this part...*
*...*
*(e) Unless licensed pursuant to this part, any attachment, judgment, decree, lien, execution, garnishment, or other judicial process, is null and void with respect to any property and interests in property blocked pursuant to §591.201"*

(3) §591.203, amongst other things, provides:

"*(a) Except as provided in paragraphs (e) or (f) of this section, or as otherwise directed by OFAC, any U.S. person holding funds, such as currency, bank deposits, or liquidated financial obligations, subject to §591.201 shall hold or place such funds in a blocked interest-bearing account located in the United States..."*

(4) The following definitional provisions apply:

(a)      §591.301, which defines the terms "*blocked account*" and "*blocked property*" as:

"*...any account or property subject to the prohibitions in §591.201 held in the name of a person whose property and*

42

**Exhibit A - 51**

*interests in property are blocked pursuant to §591.201, or in which such person has an interest, and with respect to which payments, transfers, exportations, withdrawals, or other dealings may not be made or effected except pursuant to a license or other authorization from OFAC expressly authorizing such action."*

(b)   §591.306(a), which states the *"the term license means any license or authorization contained in or issued pursuant to this part."*

(c)   §591.307, which defines *"OFAC"* as *"the Department of the Treasury's Office of Foreign Assets Control."*

(d)   §591.310, which defines *"transfer"* as *"any actual or purported act or transaction, whether or not evidenced in writing, and whether or not done or performed within the United States...".*

(e)   §591.311, which defines *"United States"* as *"the United States, its territories and possessions, and all areas under the jurisdiction or authority thereof."*

(f)   §591.312, which defines *"United States person or US person"* as:

   *"...any United States citizen, permanent resident alien, entity organised under the laws of the United States or any jurisdiction within the United States (including foreign branches), or any person in the United States;..."*

(g)   §591.313, which defines *"US financial institution"* as:

   *"...any US entity (including its foreign branches) that is engaged in the business of accepting deposits, making, granting, transferring, holding, or brokering loans or credits, or purchasing or selling foreign exchange, securities, or commodity futures or options, or procuring purchasers and sellers thereof, as principal or agent. It includes depository institutions, banks, savings banks..."*

(5) §591.403, inter alia, provides that:

   *"(a) Whenever a transaction licensed or authorized by or pursuant to this part results in the transfer of property (including any property interest) away from a person whose property and interests in property are blocked pursuant to §591.201, such property shall no longer be deemed to be property blocked pursuant to §591.201, unless there exists in the property another interest that is blocked pursuant to §591.201, the transfer of which has not been effected pursuant to licence or other authorization..."*

43

**Exhibit A - 52**

(6)§591.407 states:

"*Notwithstanding the existence of any general licence issued under this part or issued under an Executive order issued pursuant to the national emergency declared in E.O. 13692, the entry into a settlement agreement or the enforcement of any lien, judgment, arbitral award, decree, or other order through execution, garnishment, or other judicial process purporting to transfer or otherwise alter or affect property or interests in property blocked pursuant to §591.201, as referenced in §591.506(c), is prohibited unless authorised pursuant to a specific licence issued by OFAC pursuant to this part.*"

(7)§591.504, inter alia, provides:

"*Any payment of funds or transfer of credit in which a person whose property and interests in property are blocked pursuant to §591.201 has any interest that comes within the possession or control of a US financial institution must be blocked in an account on the books of that financial institution. A transfer of funds or credits by a US financial institution between blocked accounts in its branches or offices is authorized, provided that no transfer is made from an account within the United States to an account held outside the United States, and further provided that a transfer from a blocked account may be made only to another blocked account held in the same name.*"

**Exhibit A - 53**

CLAIM NO.: CL-2020-000318

03 Dec 2020

**IN THE HIGH COURT OF JUSTICE**

**BUSINESS AND PROPERTY COURTS**

**OF ENGLAND AND WALES**

**COMMERCIAL COURT (QBD)**

**BEFORE: THE HON. MRS JUSTICE COCKERILL DBE**

**BETWEEN:**

CL-2020-000318

**BANCO SAN JUAN INTERNACIONAL, INC**

**Claimant**

**-and-**

**PETRÓLEOS DE VENEZUELA, S.A.**

**Defendant**

---

**ORDER**

---

**UPON** the application of the Claimant in the above-numbered claim (the "**Claim**") for summary judgment on the Claim by its application notice dated 25 June 2020 (the "**Application**"). The Claim is made pursuant to the Claimant's rights under the credit agreement dated 23 March 2016 made between the Claimant and the Defendant (the "**2016 Credit Agreement**")

**UPON** reading the evidence

**UPON** hearing Mr Adam Al-Attar (leading Jamil Mustafa) for the Claimant, and Mr Ali Malek QC (leading William Day) for the Defendant

**UPON** the Court being satisfied that the Claimant is entitled to summary judgment on the Claim because the Defendant has, on the evidence read and submissions made by the parties, no realistic prospect of successfully

1

**Exhibit A - 55**

defending the Claim and because there is no other reason to refuse the Application

**UPON** it being recorded that "Revolving Loans" and "Term Loans" bear the meaning ascribed by the relevant definitions in section 1.01 of the 2016 Credit Agreement.

**IT IS ORDERED THAT: -**

1. Judgment is hereby entered in the Claim in favour of the Claimant and the Defendant shall therefore pay to the Claimant within 14 days the aggregate sum of US$46,656,068, which aggregate sum comprises:

   a. the principal debt owed (US$39,548,555); and

   b. contractual interest accrued to the date of this Order (US$7,107,513).

2. Interest shall accrue on the principal debt amount of US$39,548,555, which sum is due at the contractual rates of 8.25% per annum on the portion of the outstanding principal balance comprising Revolving Loans and 9.50% per annum on the portion of the outstanding principal balance comprising Term Loans, to which the Claimant is entitled after judgment pursuant to the terms of the 2016 Credit Agreement.

3. Permission to appeal is refused.

4. The Defendant shall pay the Claimant's costs in the Claim on the indemnity basis subject to a detailed assessment if not agreed.  The Claimant is entitled to proceed to a detailed assessment forthwith.  The Defendant shall pay to the Claimant within 14 days the amount of £262,175.93 as a payment on account of the Claimant's costs in the Claim.  The entitlement to costs herein (including to the payment on account) is without prejudice to the right of the Claimant to (without double recovery) recover its costs pursuant to the terms of the 2016 Credit Agreement.

2

**Exhibit A - 56**

3 December 2020

**CLAIM NO.: CL-2020-000320**

03 Dec 2020

**IN THE HIGH COURT OF JUSTICE**
**BUSINESS AND PROPERTY COURTS**
**OF ENGLAND AND WALES**
**COMMERCIAL COURT (QBD)**
**BEFORE: THE HON. MRS JUSTICE COCKERILL DBE**
**BETWEEN:**

CL-2020-000318

**BANCO SAN JUAN INTERNACIONAL, INC**

**Claimant**

**-and-**

**PETRÓLEOS DE VENEZUELA, S.A.**

**Defendant**

---

**ORDER**

---

**UPON** the application of the Claimant in the above-numbered claim (the "**Claim**") for summary judgment on the Claim by its application notice dated 25 June 2020 (the "**Application**"). The Claim is made pursuant to the Claimant's rights under the credit agreement dated 6 April 2017 made between the Claimant and the Defendant (the "**2017 Credit Agreement**")

**UPON** reading the evidence

**UPON** hearing Mr Adam Al-Attar (leading Jamil Mustafa) for the Claimant, and Mr Ali Malek QC (leading William Day) for the Defendant

**UPON** the Court being satisfied that the Claimant is entitled to summary judgment on the Claim because the Defendant has, on the evidence read and submissions made by the parties, no realistic prospect of successfully

**Exhibit A - 59**

defending the Claim and because there is no other reason to refuse the Application

**UPON** it being recorded that Loan 1" and "Loan 2" bear the meaning ascribed by the relevant definitions in section 1.01 of the 2017 Credit Agreement.

**IT IS ORDERED THAT: -**

1. Judgment is hereby entered in the Claim in favour of the Claimant and the Defendant shall therefore pay to the Claimant within 14 days the aggregate sum of US$37,230,278, which aggregate sum comprises:

    a. the principal debt owed (US$30,951,078); and

    b. contractual interest accrued to the date of this Order (US$6,279,200).

2. Interest shall accrue on the principal debt amount of US$[30,951,078], which sum is due at the contractual rates of 11% per annum under Loan 1 and 10.8% per annum under Loan 2 to which the Claimant is entitled after judgment pursuant to the terms of the 2017 Credit Agreement.

3. Permission to appeal is refused.

4. The Defendant shall pay the Claimant's costs in the Claim on the indemnity basis subject to a detailed assessment if not agreed. The Claimant is entitled to proceed to a detailed assessment forthwith. The Defendant shall pay to the Claimant within 14 days the amount of £266,365.85 as a payment on account of the Claimant's costs in the Claim. The entitlement to costs herein (including to the payment on account) is without prejudice to the right of the Claimant to (without double recovery) recover its costs pursuant to the terms of the 2017 Credit Agreement.

3 December 2020

**Exhibit A - 60**